1   Michael N. Nemelka (*pro hac vice* pending)
      mnemelka@khhte.com
2   Aaron M. Panner (*pro hac vice* pending)
      apanner@khhte.com
3   Joshua D. Branson (*pro hac vice* pending)
      jbranson@khhte.com
4   Joshua Hafenbrack (*pro hac vice* pending)
      jhafenbrack@khhte.com
5   KELLOGG, HUBER, HANSEN, TODD,
      EVANS & FIGEL, P.L.L.C.
6   1615 M Street, N.W.
    Suite 400
7   Washington, D.C. 20036
    Telephone: (202) 326-7900
8   Fax: (202) 326-7999

9   Gary Salomons (SBN 126280)
      gary@gabrielsalomons.com
10  Daniel J. Friedman (SBN 289670)
      daniel@gabrielsalomons.com
11  GabrielSalomons, LLP
    16311 Ventura Blvd., Ste. 970
12  Encino, CA 91436
    Telephone: (818) 906-3700
13  Fax: (818) 906-2142

14  *Counsel for Plaintiff Motor Vehicle*
    *Software Corporation*

15

## UNITED STATES DISTRICT COURT

16

## CENTRAL DISTRICT OF CALIFORNIA

17

| | |
|---|---|
| MOTOR VEHICLE SOFTWARE CORPORATION | CASE NO.: 2:17-cv-896 |
| Plaintiff, | MVSC'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF |
| vs. | JURY TRIAL DEMANDED |
| CDK GLOBAL, INC.; THE REYNOLDS AND REYNOLDS COMPANY; COMPUTERIZED VEHICLE REGISTRATION, INC. a/k/a CDK VEHICLE REGISTRATION, INC. | |
| Defendants. | |

## MVSC'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

PARTIES ............................................................................................................. 8

JURISDICTION AND VENUE ......................................................................... 10

FACTUAL ALLEGATIONS .............................................................................. 12

    I.    The Relevant Product Markets ............................................................ 12

           A.    The DMS Market ..................................................................... 12

                  1.    CDK and Reynolds Dominate the DMS Market .................... 13

                  2.    CDK and Reynolds Maintain Their Market Dominance by Exercising Significant Leverage Over Dealerships ............................. 14

           B.    EVR Markets ........................................................................... 17

                  1.    MVSC and CVR Are Competitors in Certain EVR Markets ............. 20

                  2.    The Illinois EVR Market ......................................................... 22

                  3.    The California EVR Market ..................................................... 23

                            a.    In California, Car Buyers Are Not Required To Obtain the Vehicle's Registration and License Plates at the Time of Sale ............................. 25

                        b.    California Has Fostered Competition in the EVR Market as a Matter of Policy ............................. 25

                        c.    MVSC's Product and Service Are Superior to CVR's ............ 26

                        d.    CVR Acquired AVRS To Try To Stop Its Market Share from Shrinking ............................. 29

                  4.    Other State EVR Markets ......................................................... 29

    II.    It Is Essential that EVR Providers Be Able To Obtain Data from a Dealer's DMS ............................. 30

           A.    Although Dealers Own the Data Stored on Their DMS, CDK and Reynolds Control Access to the Data ............................. 31

           B.    CDK and Reynolds Have Similar Third-Party Programs for Accessing Data on Their DMS Platforms ............................. 32

    III.    CDK, Reynolds, and CVR Have Illegally Agreed To Block MVSC from Participating in the 3PA and RCI Programs ............................. 34

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

A. The Facts of the Agreement Are Straightforward ............................................ 34

B. CDK and Reynolds Have Enforced the Agreement ....................................... 38

1. CDK Has Repeatedly Refused To Allow MVSC To Participate in the 3PA Program ............................................................................... 38

2. Reynolds Has Repeatedly Refused to Allow MVSC to Participate in the RCI Program .......................................................... 44

C. There is Clear Evidence of the Agreement in the Marketplace ..................... 45

IV. CVR Is Maintaining Its Monopoly Position in the Illinois EVR Market .................. 46

V. CVR Is Attempting To Monopolize the California EVR Market, and There Is a Dangerous Probability that It Will Succeed .............................................................. 48

A. CVR Is Leveraging Its Position as the Only EVR Provider To Convince Dealerships To Switch from MVSC ............................................................... 48

B. CDK and Reynolds Are Seeking To Completely Cut Off MVSC's Access to the Necessary Data on a Dealer's DMS ........................................... 50

1. CDK and Reynolds Have Cut Off MVSC's Ability To Obtain the Necessary Data from a Dealer's DMS Through Intermediaries ............................................................................... 50

a. Reynolds Eliminated Intermediary Access ........................... 51

b. CDK Eliminated Intermediary Access .................................. 52

2. CDK and Reynolds Are Trying To Eliminate MVSC's Only Remaining Route for Obtaining Data from a Dealer's DMS ............. 54

C. CDK and Reynolds Are Contacting Dealerships Served by MVSC To Pressure Them into Switching to CVR ........................................................... 57

D. Dealers Have Responded to CDK's and Reynolds's Tactics in Various Ways, Including by Switching to CVR ........................................................... 59

E. To the Extent MVSC Has Been Able To Retain Dealerships, It Is Because of MVSC's Superior Product and Service ........................................ 61

VI. MVSC Has Suffered Antitrust Injury ........................................................................ 63

VII. Defendants' Actions Have Harmed Competition ...................................................... 63

VIII. Defendants' Anticompetitive Conduct Has No Pro-Competitive Justification .......... 66

FIRST CAUSE OF ACTION: VIOLATION OF SECTION 1 OF THE SHERMAN ACT ............ 68

SECOND CAUSE OF ACTION: MONOPOLIZATION OF THE ILLINOIS EVR MARKET IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT ........................................... 69

MVSC'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

THIRD CAUSE OF ACTION: ATTEMPTED MONOPOLIZATION OF THE
CALIFORNIA EVR MARKET IN VIOLATION OF SECTION 2 OF THE
SHERMAN ACT........................................................................................................70

FOURTH CAUSE OF ACTION:  CONSPIRACY TO MONOPOLIZE THE ILLINOIS AND
CALIFORNIA EVR MARKETS IN VIOLATION OF SECTION 2 OF THE
SHERMAN ACT........................................................................................................72

FIFTH CAUSE OF ACTION:  DENIAL OF ESSENTIAL FACILITY IN VIOLATION OF
SECTION 2 OF THE SHERMAN ACT ...................................................................73

SIXTH CAUSE OF ACTION:  VIOLATION OF ILLINOIS ANTITRUST ACT...........................74

SEVENTH CAUSE OF ACTION:  VIOLATION OF CARTWRIGHT ACT...................................75

EIGHTH CAUSE OF ACTION:  VIOLATION OF CALIFORNIA UNFAIR
COMPETITION LAW...............................................................................................75

NINTH CAUSE OF ACTION: VIOLATION OF ILLINOIS CONSUMER FRAUD AND
DECEPTIVE BUSINESS PRACTICES ACT...........................................................77

PRAYER FOR RELIEF ...........................................................................................................79

MVSC'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

**INTRODUCTION**

1.      Plaintiff Motor Vehicle Software Corporation ("MVSC") brings this action to remedy and put a stop to the ongoing federal and state antitrust violations being committed by Defendants CDK Global, Inc. ("CDK") and The Reynolds and Reynolds Company ("Reynolds"), and their co-conspirator Computerized Vehicle Registration, Inc. a/k/a CDK Vehicle Registration, Inc. ("CVR").

2.      MVSC provides electronic vehicle registration and titling services ("EVR").  As an EVR provider, MVSC partners with state governments to issue the physical registration, license plates, and titles for vehicles sold at car dealerships. Electronic registration and titling has made the process far more convenient and efficient for dealerships and consumers.   Defendant CVR is a wholly owned joint venture of Defendants CDK and Reynolds that (like Plaintiff MVSC) provides EVR services.

3.      In order to process the registration and title with a state, EVR providers require basic information about the car sale – namely, vehicle, buyer, and financing details.  That information is stored on a car dealer's Dealer Management System software, otherwise referred to as a dealer's "DMS."  There is no other place where the data is stored, and without access to this data, it is impossible to provide EVR services.

4.      In addition to storing a dealer's data, the DMS manages every function of a dealer's business from sales and inventory to service and parts.  It is the mission-

critical enterprise software that a car dealership cannot operate without. Defendants CDK and Reynolds are by far the two giants of the DMS market, controlling close to 80 percent of the United States market by number of dealers, and approximately 90 percent when measured by vehicles sold. CDK and Reynolds have enormous leverage over dealers. Not only is it deeply disruptive and expensive for a dealer to switch DMS providers (switching takes up to a year of preparation and training), but CDK and Reynolds also use their market power to compel dealers to submit to long-term contracts of between five and seven years in length. As a result, CDK and Reynolds have maintained their duopoly for over two decades.

5. CDK and Reynolds have leverage over dealers for another reason: while dealers own the data on their DMS, CDK and Reynolds have taken control over who can access it. Many third-party vendors require access to DMS data in order to perform essential tasks – such as EVR services – for the dealer. CDK and Reynolds provide vendors access (for a fee) to the data on a dealer's DMS pursuant to formal third-party access programs. CDK's arrangement is called the Third Party Access ("3PA") program, and Reynolds's is called the Reynolds Certified Interface ("RCI") program. These programs allow third-party vendors to access – in real time – the necessary data from a dealer's DMS in order to provide services for the dealership.

6. This case concerns an illegal horizontal agreement between CDK and Reynolds to exclude MVSC from their third-party programs in order to prevent MVSC from obtaining the data it needs to provide EVR services. The purpose of the

MVSC'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

conspiracy is simple and obvious: by blocking MVSC's access to the data on which its services depend, CDK and Reynolds seek to eliminate a formidable competitor to CVR, their wholly owned and jointly controlled EVR venture. Money is the motive. CVR has for decades served as a reliable cash cow for CDK and Reynolds; it has long been the largest EVR provider in the United States, covering more states and processing more transactions than any other provider. Through their illegal conspiracy to insulate CVR from competition, CDK and Reynolds are seeking to protect that flow of profits into their coffers.

7.    MVSC competes with CVR in two state EVR markets – Illinois and California. In the Illinois EVR market, CVR maintains a monopoly of approximately 95 percent market share. Real-time access to DMS data is a pre-requisite to competing in Illinois because the state requires that a dealership provide the registration and license plates to the car buyer at the time of sale. Participation in the 3PA and RCI programs is the only means for an EVR provider to obtain this real-time access to DMS data. By blocking MVSC (and all other Illinois EVR providers) from their third-party programs, CDK and Reynolds have ensured that CVR will maintain its monopoly position in Illinois.

8.    In the California EVR market, CVR had a monopoly until a few years ago. But in California – unlike in Illinois – a car buyer is not required to receive the registration and license plates at the time of sale. Real-time access to DMS data (and participation in the 3PA and RCI programs) has therefore not been necessary in

California until now.  Instead, MVSC was able to obtain the required DMS data by other means, either through companies that provided intermediary access to a dealer's DMS or through a manual workaround whereby dealers ran a daily report with the necessary data and then transmitted the information to MVSC.  As a result, MVSC was able to compete in the California EVR market based on the quality of its products and services, which are vastly superior to CVR's and much preferred by car dealerships.  As one tangible example of the disparity in service quality, it takes CVR a minimum of 30 days to process and ship registrations and license plates to car buyers, whereas MVSC accomplishes the same in one day.

9.     Because CVR cannot compete with MVSC on quality and service, CDK and Reynolds have engaged in a campaign to completely block MVSC's access to a dealer's DMS data in California.  Not only have CDK and Reynolds blocked MVSC from participating in their 3PA and RCI programs, but they have successfully cut off MVSC's access through intermediaries.  Worse, they are intimidating dealers with a drumbeat of near constant threats that if dealers continue to provide MVSC with the DMS data, then the dealers will be in breach of the DMS contract.

10.     The facts of the illegal agreement to block MVSC from DMS data are straightforward.  The ringleaders are Scott W. Herbers, CVR's longtime general manager who, while running CVR, simultaneously worked as a senior CDK executive; Robert N. Karp, president of CDK's North American region; and Bob Schaefer, Director of Reynolds's data services.  The conspiracy has existed since at

4

least 2014, and continues to this day.  It was formed at the behest and with the direct participation of CVR.  Based on information from a participant in the conversations, CDK even has a name for the illegal conspiracy – the "Closed Category."  That is, EVR is a "closed category" to MVSC within the 3PA and RCI programs.  A senior CDK executive even told MVSC that there are those within CDK who think the agreement is wrong and that MVSC should be able to compete with CVR on equal footing, but that Mr. Herbers and Mr. Karp have rejected any such argument.

11.     CDK and Reynolds have enforced the illegal agreement with rigid discipline.  Every time MVSC has applied to participate in the 3PA and RCI programs, CDK and Reynolds have said, "No."  Lower-level CDK and Reynolds executives have admitted that the reason MVSC is not allowed to participate is because it is a competitor of CVR, and the decision to block MVSC was made "far above" their level – i.e., by Mr. Herbers, Mr. Karp, and Mr. Schaefer.  Sometimes the rejection has been outright without explanation.  Other times, CDK and Reynolds have demanded an extortive fee – at first 33 percent and with later applications, 25 percent – of MVSC's top-line revenues to participate in the 3PA and RCI programs. CDK and Reynolds knew MVSC could never accept such terms (MVSC would lose money on every dealership and would no longer be able to operate as a going concern) and the demands were therefore an effective refusal to deal.  Moreover, such demands were the opposite of what CDK and Reynolds stated publicly.  For example, CDK represents in its program guide: "Our 3PA pricing philosophy is

simple: standardized pricing for all customers." But privately, CDK admitted to MVSC that such "standardized pricing" does not apply to MVSC because it competes with CVR. Remarkably, a top CVR executive confirmed that the extortive price quotes were not serious and were simply designed as an effective refusal to deal. He stated to MVSC: "I wish we would have asked for 85 percent of your revenue. We don't want you in the program."

12.     For many dealers, the campaign to cut off MVSC and then convert dealerships to CVR has worked. "I have really bad news," one dealer wrote in typical fashion. "We are not going to be able to keep DMVDesk since CDK is only approving CDK Licensed approved vendors to have access to our [DMS]." Other dealers have expressed genuine fear about the disruption caused by the blocking of MVSC. "Help!" one dealer exclaimed. "Where do we go from here??" The California New Car Dealers Association has even had to get involved. Representing over 1,100 dealers, it is the country's largest state association of franchised new car dealers. The Association has advised some of its members that CDK's and Reynolds's "conduct as it relates to the [EVR] program [is] troubling not only from a business perspective but also from the damage it could do to consumers and the DMV for the roadblocks it is creating in the vehicle registration process itself."

13.     To the extent MVSC has been able to retain dealerships, it is because of MVSC's superior product and service and the dealers' belief that what CDK and Reynolds are doing is wrong. Nevertheless, Defendants' conspiracy has had its

intended effect.  By excluding MVSC from their 3PA and RCI programs, and seeking to block MVSC from obtaining DMS data through other means, Defendants' illegal conspiracy has protected CVR's monopoly in the Illinois EVR market and created a dangerous probability that CVR will regain its monopoly position in the California EVR market.  The conspiracy has caused MVSC to suffer millions of dollars in damages.  It has also harmed competition by reducing dealer choice (effectively preventing dealers from going with their preferred EVR provider), degrading the quality of EVR services, increasing the quality-adjusted price of EVR services, and eliminating competition in concentrated state EVR markets.

14.     As described in detail herein, Defendants' conspiracy is a per se violation of Section 1 of the Sherman Act, and their monopolization of the Illinois EVR market and attempted monopolization of the California EVR market are violations of Section 2 of the Sherman Act.  CDK and Reynolds have also violated Section 2 of the Sherman Act by denying MVSC an essential facility – access to DMS data – over which they maintain exclusive control.  Defendants' conduct is also prohibited by California and Illinois state antitrust and unfair competition laws.

15.     In this action, MVSC seeks to recover the damages it has suffered as a result of Defendants' federal and state antitrust violations.  In addition, MVSC also seeks an injunction (1) enjoining Defendants from engaging in their illegal anticompetitive conduct, and (2) requiring CDK and Reynolds to permit MVSC to

participate in their 3PA and RCI programs, and therefore have access to required DMS data, on reasonable and nondiscriminatory terms.

16. The allegations set forth herein are based on corporate knowledge and documents and information in MVSC's possession; discussions with current and former employees of Defendants; documents and emails that were drafted in whole or in part by Defendants and their current or former employees; publicly available documents, including Defendants' press releases, public statements, and filings with the Securities and Exchange Commission ("SEC"), news articles, scholarly articles, and court documents submitted in other proceedings; and documents and information from third parties, including automotive dealerships and state regulatory authorities.

## **PARTIES**

17. Plaintiff Motor Vehicle Software Corporation ("MVSC") is a California corporation with its corporate headquarters and principal place of business at 29219 Canwood Street, Suite #205, Agoura Hills, California 91301. Formed in 2005, MVSC provides Electronic Vehicle Registration ("EVR") services to automobile dealerships in California, Oregon, and Illinois. MVSC is working to gain approval in the Virginia EVR program. MVSC is privately owned.

18. Defendant CDK Global, Inc. ("CDK"), is a Delaware corporation with its corporate headquarters and principal place of business at 1950 Hassell Road, Hoffman Estates, Illinois 60169. CDK has many employees and multiple offices in California. CDK's headquarters for the western region of the United State are

located at 1100 Town and Country Road, Suite 800, Orange, California 92868. CDK provides Dealer Management System ("DMS") software and services to automobile dealerships throughout the United States, including in California, and has more than $2 billion in annual revenues. In 2014, CDK was spun off from ADP, LLC, and is now an independent, publicly traded company in which ADP retains no ownership interest. Prior to the spin-off, CDK was referred to as ADP Dealer Services (collectively, referred to herein as "CDK").

19.     Defendant The Reynolds and Reynolds Company ("Reynolds") is an Ohio corporation with its corporate headquarters and principal place of business at One Reynolds Way, Kettering, Ohio 45340. As with CDK, Reynolds provides DMS software and services to automobile dealerships throughout the United States, including in California. To service those dealerships in California, Reynolds has many employees that work in and travel to the state. Though formerly a publicly traded company, Reynolds was privately acquired in 2006.

20.     Defendant CDK Vehicle Registration, Inc. a/k/a Computerized Vehicle Registration, Inc. ("CVR") is a California corporation with its corporate headquarters and principal place of business at 1100 Town and Country Road, Suite 800, Orange, California 92868, sharing an office with CDK's California headquarters. CVR was founded in 1992 and is a wholly owned joint venture of CDK and Reynolds, with CDK having an 80 percent and Reynolds a 20 percent ownership stake in the joint venture. CVR promotes itself as the national market leader in EVR, servicing more

9

than 15,000 dealerships in 23 states and processing over 14 million EVR transactions a year.

## JURISDICTION AND VENUE

21.     This action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26; and California and Illinois state law.

22.     This Court has jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because those claims are so closely related to the federal claims that they form part of the same case or controversy.

23.     Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b), (c), and (d).  One or more of the Defendants resided, transacted business, were found, or had agents in the District; a substantial part of the events giving rise to MVSC's claims arose in the District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in the District.  In particular, MVSC and CVR reside and are headquartered in this District; CDK has its western region headquarters in this District; and CDK and Reynolds serve many dealerships in this District.

24.     The Court has personal jurisdiction over Defendants because they are engaged in ongoing and systematic business in the State of California.  Defendants have also engaged in the unlawful acts described in this Complaint with the foreseeable or intended effect of causing substantial economic harm to MVSC in California.  Defendants purposefully availed themselves of the privilege of doing business in California through the widespread promotion, sale, marketing, and distribution of their products and services in the state.  This lawsuit arises from and relates to Defendants' California activities – namely, their unlawful conspiracy and attempts to deny Plaintiff access to the DMS platforms of California automobile dealerships and their attempted monopolization of the California EVR market.  Through their unlawful acts, Defendants have caused substantial economic harm in California.  This Court's exercise of jurisdiction over Defendants by California courts is consistent with traditional notions of fair play and substantial justice.  Moreover, CVR is subject to general jurisdiction in California, because CVR's principal place of business is in California.

25.     Defendants are engaged in, and their activities substantially affect, interstate commerce.  CDK and Reynolds sell DMS to automobile dealerships throughout the United States, including in California, and their third-party access programs make the data stored on their DMS platforms available on a nationwide basis.  CVR sells EVR products and services to automobile dealerships throughout the United States, including in California.

11

MVSC'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

# FACTUAL ALLEGATIONS

## I.     The Relevant Product Markets

26.     The relevant product markets for MVSC's claims are: (1) the DMS Market in the United States; and (2) the Illinois and California EVR Markets.

### A.     The DMS Market

27.     Dealer Management System software is enterprise software designed specifically for retail automotive dealerships.  The software helps dealers manage every aspect of their business from sales and inventory to service and parts.  The DMS has been analogized to the central nervous system of a car dealership. Specifically, DMS software handles and integrates all of the critical business functions of a car dealership, including sales, financing, inventory management (both vehicle and parts), repair and service, accounting, payroll, marketing, and more.  In short, DMS software is the mission-critical software that enables dealerships to run their operations and function as a business.  Industry publications describe the DMS as "the center of a dealer's entire retail management platform.  It's impossible to operate without it."

28.     Importantly, the DMS is also the place where a dealer's data is stored, such as vehicle, customer, and sales information.

29.     In addition to providing the software, DMS providers often lease and maintain the computer hardware, including a dealer's desktop computers and servers. DMS providers also frequently provide and manage a dealer's telephone system,

including handling incoming customer calls, transferring calls among a dealer's several departments, and controlling the messaging when a customer is on hold. The DMS provider controls every aspect of a dealer's business.

30.     DMS providers license and sell their software and services pursuant to written contracts. The DMS market is comprised of those providers – including CDK and Reynolds – that sell and market DMS services to automobile dealerships in the United States. Geographically, the DMS market is the United States. There is public and industry recognition of the DMS market. There are no reasonable substitutes for the enterprise software and services provided by DMS providers to retail automotive dealerships.

### 1.     CDK and Reynolds Dominate the DMS Market

31.     CDK and Reynolds are by far the dominant providers in the DMS market. Combined, CDK and Reynolds control 70 to 80 percent of the DMS market in the United States. They share that dominant position equally, with each controlling approximately 35 to 40 percent of the DMS market. This market dominance by CDK and Reynolds – in both their combined market control and the equal division of market share between the two companies – has been stable for over two decades.

32.     When calculated using vehicle sales (as opposed to dealership rooftops), CDK's and Reynolds's dominance of the DMS market is even more pronounced. CDK and Reynolds control approximately 90 percent of the DMS market based on

13

the number of vehicles sold.

33.     Aside from CDK and Reynolds, the DMS market is diffuse, with an array of vendors dividing up the remaining market share.  These vendors are typically small, occupy a particular niche, and serve the country's mom-and-pop car dealerships.

34.     Based on the foregoing, it is no surprise that industry publications variously describe CDK and Reynolds as "the Big 2," "the Duopoly," "the two 400-pound gorillas," and "the two giants of the DMS market."

35.     CDK and Reynolds have enormously lucrative DMS businesses. Reports estimate that a typical midsize dealership pays over $75,000 per year for DMS services offered by CDK or Reynolds.  Larger dealerships typically pay over $250,000 per year.  Given the thousands of dealerships that CDK and Reynolds serve, and with profit margins exceeding 40 percent, CDK and Reynolds are extremely profitable.  CDK's market capitalization is $9 billion.  Reynolds is privately owned by Bob Brockman, a billionaire many times over.

### 2.     CDK and Reynolds Maintain Their Market Dominance by Exercising Significant Leverage Over Dealerships

36.     CDK and Reynolds have powerful leverage over car dealerships, and they use that leverage to protect their dominant position and keep dealers in line. First, CDK and Reynolds sell their DMS software and services pursuant to long-term contracts, typically between five and seven years in length.  CDK and Reynolds

therefore lock in their dealers with lengthy contracts.

37.     Second, it is enormously difficult and disruptive for a dealer to switch DMS providers.  One industry executive stated that changing DMS providers "is akin to a heart transplant."  CDK's CEO recently acknowledged that "switching DMS providers can be very difficult.  It [is] quite a process to change and takes time, which is part of the reason that many dealers are hesitant to switch."  One large dealer publicly referred to changing DMS providers as "mission impossible."  Both Reynolds and CDK have publicly touted that their market positions are secure because of this very fact.

38.     Switching DMS providers is so difficult because it disrupts and changes nearly every process that a dealer uses to operate.  For a typical dealership to change DMS providers, it takes at least a year of preparation, staff training, and testing before the new system is even put into operation.

39.     The experience of Hendrick Automotive Group, the largest privately held dealership group in the country, is illustrative.  In May 2016, Hendrick announced that it had decided to switch from Reynolds to CDK, with the goal of completing the transition by mid-2017.  The fact that a large dealership had decided to switch DMS providers was momentous news in the automotive industry.  However, just months later, CDK disclosed that Hendrick had decided against the move after all.  The switchover to CDK had already begun but was halted because of the difficulty and disruption caused by the attempt.  Hendrick remained with

Reynolds.

40.     Third, a dealer cannot operate without a functioning DMS.  CDK and Reynolds can paralyze a dealer's business by altering the DMS or restricting critical third-party applications from interacting with it.

41.     Fourth, the DMS houses a dealer's data, including data relating to customer, sales, inventory, marketing, accounting, financial, and other information. Although the data is owned by the dealership, CDK and Reynolds control who is allowed to access it.  Dealerships are therefore vulnerable because many third-party vendors need to access the data stored on the DMS in order to provide services, such as EVR.  In short, DMS providers can severely disrupt a dealership's business simply by switching off third-party access to essential data.  As detailed below, that is exactly what is happening here: CDK and Reynolds are blocking MVSC from obtaining data that is needed to provide EVR services to dealerships and ultimately to the customers of those dealerships.

42.     Finally, Reynolds and CDK are vindictive when spurned by dealerships that try to switch DMS providers.  For dealers, that makes swapping DMS providers not only a logistic nightmare, but a risky and litigious proposition.  There is a large collection of lawsuits brought by CDK and Reynolds against dealers that tried but failed to switch DMS providers.  The lawsuits tell the story of how deeply damaging an unsuccessful change in DMS providers can be.  One publicized case involved a dealer that had been with Reynolds for over 20 years and tried to change providers.

MVSC'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Reynolds and the dealer ended up in court, with Reynolds refusing to release the dealer's data stored on its DMS. The lawsuit tied up the dealer's business for months, with the dealer eventually capitulating to an out-of-court settlement with Reynolds.

43.     The leverage that CDK and Reynolds exert over dealers is the source of their long-standing – and equally shared – domination of the DMS market. It also serves as a durable competitive advantage. The DMS market has been so tightly controlled for so long by CDK and Reynolds that even Microsoft Corp., the global software behemoth, could not compete with them. Microsoft tried to enter the DMS market in 2006 but failed. In trying to take on CDK and Reynolds, a Microsoft executive publicly conceded, "We kind of got ahead of ourselves."

**B.     EVR Markets**

44.     As noted above, the DMS houses a car dealership's most important data, including customer, vehicle, and sales information. Many third-party software vendors need to access the data stored on the DMS in order to perform essential tasks for the dealer. One of those essential tasks is electronic vehicle registration and titling.

45.     Twenty years ago, states registered and titled vehicles internally through their respective Department of Motor Vehicles ("DMV"). Now, approximately 30 states have changed their laws to allow authorized, state-licensed firms from the private sector to electronically register and title vehicles in partnership with the

state's DMV.  Only state-approved firms are permitted to operate as an EVR provider in the state.

46.     Firms that provide EVR services require three categories of information from a dealer's DMS: (1) car buyer identification; (2) vehicle identification; and (3) financing information.  The EVR provider processes that information with the DMV (ensuring that all necessary information is complete and accurate); calculates and transmits the requisite fees to the DMV; and then issues the registration stickers and license plates to the car buyer.  Once the registration is complete, the DMV issues the title to the vehicle owner, whether to the car buyer (if the purchase was outright) or to the lender (if the purchase was financed).

47.     EVR offers many advantages over the prior brick-and-mortar approach. Through EVR, registration and titling of vehicles is completed electronically.  It makes the process much quicker and more efficient, eliminates the need to go to the DMV, reduces the amount of paperwork, and minimizes errors.  Car buyers benefit by receiving their registration and license plates quicker and with a lot less hassle. Car dealerships benefit by having a third-party vendor ensure that the critical functions of licensing and titling cars are performed accurately and promptly for the dealer's customers as well as in compliance with specific deadlines imposed by certain states, including California.  And the government benefits from increased efficiency and performance of an important governmental function, in addition to freeing up resources at the DMV to perform other work.

MVSC'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

48.     Although states regulate the EVR providers within their boundaries, states do not decide which EVR provider a dealership uses.  Instead, dealerships themselves select which authorized EVR provider will electronically register and title the vehicles sold at their dealership.  Once a dealership selects an EVR provider, the parties notify the DMV and enter into a written contract, which are typically month-to-month in length.

49.     An EVR market is comprised of those vendors that are authorized to provide EVR services within a given state.  Each state's EVR market is a separate geographic market.  EVR services in one state are not substitutes for EVR services in another state.  Each state prescribes the metes and bounds of its particular EVR market.  Only those providers approved in a particular state are able to offer EVR services within that state, such that an EVR provider in one state does not compete with EVR providers operating only in other states.  Similarly, a dealership in one state cannot use an EVR provider licensed in another state.

50.     There is public and industry recognition of individual state EVR markets.  There is also public and industry recognition that EVR markets are geographically confined to the state level.

51.     Individual state EVR markets are generally highly concentrated and have high barriers to entry.  For example, as described below, CVR has a monopoly as the only effective EVR provider in several states, including Illinois, and there are just three providers in California.  New entrants to an EVR market face extensive

MVSC'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

legal licensing and DMV requirements, as well as high capital and technological startup costs.

### 1. MVSC and CVR Are Competitors in Certain EVR Markets

52. **CVR.** CVR, short for Computerized Vehicle Registration, was founded in 1992 and describes itself as the world's largest provider of EVR services. In the United States, it provides EVR services to over 15,000 dealerships across 23 states. It processes nearly 15 million EVR transactions annually. It is far and away the largest EVR provider in the United States, covering more states and processing more transactions than any other competitor.

53. CVR is wholly owned by CDK and Reynolds. In 1992, CDK and Reynolds partnered to acquire CVR. CVR ensured that both Reynolds and CDK partnered in the acquisition so that CVR could claim to dealers that its owners controlled upwards of 90 percent of the DMS market, and that it had direct access to the data stored on their DMS platforms. According to CVR itself, its exclusive status as the only EVR provider with direct access to DMS data was a critical factor in its rapid expansion and eventual dominance of state EVR markets.

54. Over the years, CVR has returned hundreds of millions of dollars in profits to CDK and Reynolds. For decades, CVR has been an undeniable cash cow and reliable moneymaker for its owners.

55. CVR is a wholly owned joint venture of CDK and Reynolds and is therefore controlled by them. They control CVR's direction and management. They

20

have representatives on CVR's board of directors. CDK and Reynolds executives hold supervising authority over CVR's operations and personnel. In its public filings, CDK states that it "holds a controlling financial" and a controlling "management interest" in CVR. CDK includes CVR's financial results in CDK's consolidated and combined financial statements. CDK therefore does not break out CVR's financial results in its public financial statements. Moreover, CVR's headquarters are located within CDK's California offices. CDK even posts new job listings for CVR. CDK and Reynolds refer to CVR as "our" EVR service. CDK and Reynolds hold themselves out to the industry as the controlling managers of CVR, and CVR likewise markets itself as a unit of the DMS giants. As CVR advertises on its website, "we are backed by the leading DMS providers in the industry – CDK Global and Reynolds & Reynolds."

56. **MVSC.** MVSC was formed in 2005 to compete in the California EVR market. At the time, CVR controlled approximately 90 percent of the California EVR market and therefore held a monopoly position. Market research exposed widespread dealer dissatisfaction with CVR, primarily because of its poor service to dealers and car buyers. MVSC therefore centered its business on providing top-quality and personalized service and support to dealers and car buyers. As a result of its service-oriented culture, MVSC has been able to make inroads into CVR's monopoly position in California.

57. MVSC's EVR product in California is called "DMVdesk." It is a web-

based service for providing EVR services with sophisticated tools for workflow and inventory management. As a web-based application, there is no need to load software onto a dealer's hard drive. DMVdesk is widely recognized as the most efficient and easy-to-use EVR application in the market today.

58. Building on DMVdesk's success, MVSC has created a new EVR product called Vitu (pronounced "v-two," as in "version two"). Vitu automates even more steps in the EVR process. It also allows dealers to process EVR transactions across multiple stores through a single user interface. As MVSC expands to other EVR markets, MVSC will introduce Vitu in those states and eventually California.

59. There are two state EVR markets at issue in this complaint: the Illinois EVR market and the California EVR market.

### 2. The Illinois EVR Market

60. Illinois began allowing EVR services in 2005. Illinois mandates the use of EVR for the registration and titling of every new vehicle sold in the state. Therefore, every franchised automotive dealership must contract with an EVR provider to perform those services. Illinois also requires that the printed registration and license plates be provided to the car buyer at the time of sale. Illinois law provides that a car buyer can be charged no more than $25 for the EVR service. EVR providers can charge up to $10 for their services, with dealers able to add an additional 1.5 times that amount, for a total of $25.

61. CVR has a monopoly over the Illinois EVR market. It possesses

approximately 95 percent of the market, and has maintained that monopoly position since Illinois began allowing EVR services in 2005.

62.     MVSC is an approved EVR provider in Illinois, and has maintained an office there since 2014.  But like the other three EVR providers approved in Illinois (Dealertrack, Electronic License Service, and S&S License and Title Service), MVSC cannot make any inroads into the market for a very specific and undisputed reason: CVR is the only EVR provider that is allowed direct access to CDK's and Reynolds's DMS.  That direct access enables CVR to obtain the required data from the DMS instantaneously, which is necessary to comply with the state requirement that the registration and license plates be provided to the car buyer at the time of sale.

63.     Because MVSC does not have direct access to the DMS – due to CDK's and Reynolds's concerted group boycott – MVSC is effectively blocked from competing with CVR in Illinois.

64.     As discussed below, there is no alternative to obtaining the data from a dealer's DMS.  That is the only place the data is stored.  It is nowhere else.  Dealers do not and would not enter the data into a separate platform just for EVR services.  No dealer does it.  Doing so would eliminate many of the primary benefits of EVR services, chief among them increased efficiency and decreased error rates.

### 3.     The California EVR Market

65.     California began allowing EVR services in 1997.  California is by far the largest vehicle market in the United States.  Consequently, it is also the largest

and most important EVR market.

66.    Like Illinois, California mandates the use of EVR, and every dealership must therefore contract with an EVR provider.  Unlike Illinois, however, California does not require that the printed registration and license plates be provided to the car buyer at the time of sale.  Instead, California requires that car buyers receive their registration and license plates within 90 days of the purchase date.  It is the responsibility of the car dealership to comply with this requirement.  If car buyers do not receive their registration and license plates within 90 days of purchase, the dealer's business license from the DMV can be revoked.

67.    California law provides that a car buyer can be charged no more than $29 for the EVR service, of which $4 is paid to the DMV, and the remaining amount is paid to the EVR provider.  There is no statutory cap on what an EVR provider can charge a dealer per transaction.  Therefore, while an EVR provider could charge a dealer much more than $29 per transaction, the dealer can only pass through $29 to the car buyer.  The dealer would have to bear the cost of any excess, which no dealer is willing to do.  Therefore, there is an effective cap of $29 per transaction that an EVR provider charges to dealers.

68.    CVR entered the California EVR market in 1997.  Until several years ago, CVR maintained a monopoly in California, controlling approximately 90 percent of the EVR market.

69.    MVSC entered the EVR market in 2005.  At first, MVSC made only

24

small inroads into CVR's monopoly. However, three factors have allowed MVSC to compete with CVR in California: (1) car buyers are not required to receive their registration and license plates at the time of sale; (2) California has fostered competition in the EVR market as a matter of policy; and (3) MVSC's product and service are far superior to CVR's.

### a. In California, Car Buyers Are Not Required To Obtain the Vehicle's Registration and License Plates at the Time of Sale

70. The most important factor that enabled MVSC to compete against CVR in California is that, unlike Illinois, California does not require that a car's registration and license plates be delivered to the car buyer at the time of sale. That means instantaneous access to a dealer's DMS data is not required to provide EVR services in California. As a result, EVR providers that are not directly integrated with the CDK and Reynolds DMS platforms – i.e., every EVR provider other than CVR – have been able to provide EVR services by obtaining the necessary data from a dealer's DMS at a later time through different means. As described below, however, CDK and Reynolds in concert are systematically eliminating MVSC's ability to obtain the necessary data from the dealership's DMS in an effort to eliminate MVSC as a competitor in the California EVR market.

### b. California Has Fostered Competition in the EVR Market as a Matter of Policy

71. Competition between EVR providers is a central purpose of California's

EVR program, and the California legislature has taken steps to ensure a competitive EVR market.  The legislature recently reaffirmed that maintaining EVR competition – in which providers compete to offer the highest-quality EVR service – is the official state policy.

72.     In 2015, the legislature noted that certain EVR providers, including CVR, were attempting to undercut the standalone EVR market by "incentivizing dealers to enter into new EVR agreements by providing other services for free or at a heavily discounted rate.  These additional services include dealer management systems, digital retailing services, or Web site management."  Concurrence in Sen. Amendments AB 605 (Gatto) (June 16, 2015).  In other words, EVR providers were using what they charged dealers for their EVR product to subsidize the price of their other products and services.  In response, the legislature enacted a new law "aim[ed] to clarify that the charge being paid by consumers for electronically filing title and registration documents with the DMV does not include costs associated with services unrelated to EVR."  *Id*.; *see* Cal. Vehicle Code § 4456.5(a)(2)).  The law therefore preserved a discrete EVR market in which EVR providers compete with each other to deliver EVR-specific services, without drawing on their other products and services.

### c.     MVSC's Product and Service Are Superior to CVR's

73.     Finally, MVSC has been able to compete with CVR because MVSC's product and service are vastly superior.  Because output and price are both regulated

(i.e., EVR is mandated and the EVR fee to dealers is effectively capped, *see supra* Part 1.B.3), price is not a consideration for a dealership in selecting the EVR provider.  Instead, EVR providers compete on the quality-adjusted price per registration.  EVR providers differentiate themselves through customer service (to dealers and buyers), speed of processing, accuracy, and the user-friendliness of their products.

74.    Dealers much prefer MVSC's product and service to the EVR service provided by CVR.  With respect to the product, MVSC's DMVdesk is a web-based program that is much more flexible than CVR's product, which must be installed on a dealer's hard drive.  Dealers widely acknowledge that DMVdesk's user interface is simpler and easier to use.  There is also more automation with DMVdesk, requiring fewer steps to complete the EVR process.

75.    With respect to service, there is no comparison.  In California – where EVR providers do not issue the registration and license plates at the point of sale, but instead process them after the purchase – it takes CVR at least 30 days and sometimes as much as two months to deliver the physical registration and license plates to car buyers.  MVSC accomplishes the same in one day.  CVR's months-long backlog versus MVSC's same-day turnaround provides a tangible example of MVSC's superior service as compared to CVR.

76.    MVSC also offers 24/7 customer service – a dealership can call or message MVSC at any time of the day, and MVSC will respond almost immediately

to help resolve any issues. MVSC provides extensive training for dealership employees to ensure they know how to use DMVdesk and understand the legal and technical requirements for EVR. MVSC also conducts monthly onsite visits to ensure that there are no latent issues that have not been addressed. Perhaps most illustrative of the ways MVSC provides superior service to dealers, MVSC even dispatches backup clerks to a dealership's offices when the dealership has someone out sick or is understaffed.

77.     In terms of quality control, MVSC's procedures exceed anything in the market. MVSC audits the paperwork and information for every EVR transaction. MVSC even videotapes the processing of every piece of paper so that if issues arise later, there is a video record of what MVSC actually received. Due to MVSC's fastidious procedures, MVSC has the lowest error rate in the market.

78.     Finally, MVSC has also brought innovation to the market in terms of dealer choice. Prior to MVSC entering the California EVR market, the standard length of an EVR provider's contract with a dealer was two years. CVR insisted that dealers agree to two-year contracts in order to make it difficult for those dealers to switch EVR providers. MVSC then entered the market and introduced the month-to-month contract in order to provide more flexibility for dealers. As a result of this innovation, the standard EVR contract in California – including from CVR – is now month-to-month, giving dealers greater flexibility to continually select the EVR provider of their choice.

### d. CVR Acquired AVRS To Try To Stop Its Market Share from Shrinking

79.     As a result of the three factors listed above, MVSC slowly but surely increased its market share in California, while CVR saw its market share decrease. In order to stop the slide, CVR made a major acquisition in 2015.  On April 2, 2015, CVR acquired AVRS, Inc. ("AVRS") for $49.5 million.  At the time, AVRS was a quickly growing EVR provider in California.  CVR hoped that the combination of AVRS with CVR's "seamless end-to-end DMS integration" would reestablish CVR's monopoly in the California EVR market.  The expensive ploy did not work. After the acquisition, AVRS's service to its dealerships quickly deteriorated to CVR's inferior levels.  As one dealer wrote to CVR in the summer of 2016, referring to AVRS: "I have always stated that your customer services etc. were the most important reason for staying with AVRS over DMV Desk, since your products are so similar.  Since the CDK [i.e., CVR] buyout, we have noticed a huge decline in service."

80.     Today, due to its superior product and service, MVSC has been able to earn approximately 50 percent of the EVR market in California.  CVR still controls approximately 40 percent of the market, while Dealertrack has the remaining ten percent.

### 4. Other State EVR Markets

81.     CVR maintains a monopoly or dominant position in many other state

EVR markets, including Michigan, Wisconsin, West Virginia, and South Carolina. MVSC plans to enter other EVR markets, including Wisconsin and Virginia. But so long as CDK and Reynolds deny MVSC access to the dealer data stored in their DMS platforms, it will be very difficult, if not impossible, for MVSC to compete in those markets.

82.     Besides California, there is one state in which MVSC has been able to break CVR's stranglehold – Oregon. Until last year, CVR maintained a monopoly in Oregon, controlling virtually 100 percent of the EVR market. Because of CVR's abysmal service, Oregon sought to introduce competition into its EVR market and license other EVR providers. MVSC applied, and Oregon approved MVSC as an EVR provider in the state. After MVSC entered the market, instead of competing, CVR decided to leave the Oregon market altogether because of the market's small size. As a result, MVSC is now the leading EVR provider in the Oregon EVR market.

## II.     It Is Essential that EVR Providers Be Able To Obtain Data from a Dealer's DMS

83.     In order for an EVR provider to participate in an EVR market, it is necessary that the provider be able to retrieve the following specific information about the sale of a car from the dealer's DMS: (1) identity of the car buyer; (2) car make, model, and VIN; and (3) financing information.

84.     It is impossible to provide EVR services without that information,

MVSC'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

which must be provided to a state's DMV in order to complete the electronic registration and titling of a car.  A dealer's DMS is the only place to obtain this information.  There is no other way to obtain it.  Dealers do not store this information on any other system or platform.  Dealers do not and would not enter the data separately somewhere else.  Nobody in the industry disputes that being able to retrieve this data from a dealer's DMS is essential, necessary, and required to function as an EVR provider.  As CDK describes it, the data on a dealer's DMS is "irreplaceable."

**A.   Although Dealers Own the Data Stored on Their DMS, CDK and Reynolds Control Access to the Data**

85.   The data on a dealer's DMS is not owned by the DMS provider.  Rather, the data is owned exclusively by the dealers.  CDK and Reynolds admit as much.  CDK publicly states that it "has always understood that dealerships own their data and enjoy having choices on how best to share and utilize that data with others."  Similarly, Reynolds has declared, "The data belongs to the dealers.  We all agree on that."

86.   Even though dealers own the data, CDK and Reynolds have seized control over who can access it.  CDK and Reynolds prohibit dealers from providing data stored on the dealer's DMS to third-party vendors through "unauthorized means" – which CDK and Reynolds interpret to mean any access not specifically approved by them.  To provide "unauthorized" access, according to CDK and

Reynolds, constitutes a "hostile integration" with the DMS and is a breach by the dealer of the DMS contract. Instead of dealers, therefore, CDK and Reynolds control the flow of data from a dealer's DMS to third-party vendors.

87. CDK and Reynolds charge third-party vendors large fees for accessing data stored on a dealer's DMS. Doing so is a major and growing revenue source for CDK and Reynolds. It is a driving factor behind their large margins and high profitability. The fact that CDK and Reynolds – rather than the dealers themselves – profit from charging third parties for access to the dealers' own data is a prime example of the imbalance of power between the dealers and the DMS providers. Indeed, in nearly every case, the third-party vendors pass the cost of access to DMS data on to the dealers themselves in the form of higher service fees – in effect, dealers have to pay CDK and Reynolds for access to their own data.

**B. CDK and Reynolds Have Similar Third-Party Programs for Accessing Data on Their DMS Platforms**

88. CDK and Reynolds provide access to the data on a dealer's DMS through official third-party access programs. CDK's access program is called Third Party Access ("3PA"). Reynolds's is called the Reynolds Certified Interface ("RCI"). These programs supply the only means through which third-party vendors can retrieve – instantaneously and in real time – the data necessary to provide services for the dealership. Participation in these two programs is also the only way that third-party vendors become "certified" to obtain data from a dealer's DMS.

MVSC'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

89.     As CDK and Reynolds repeatedly tout to dealers, the 3PA and RCI

programs are the "only approved methods for accessing" data on a dealer's DMS.

Any other method for accessing data from a dealer's DMS is "unauthorized."

90.     Participation in the 3PA and RCI programs allows a third-party vendor

to obtain the needed data from a dealer's DMS, and to do so in real time.  For

example, when a dealership sells a vehicle, the vendor can immediately retrieve data

about that the car buyer, the vehicle, and the financing details.

91.     As for pricing, CDK publicly states that the pricing for participation in

the 3PA program is standardized and the same for all vendors.  "Our 3PA pricing

philosophy is simple," CDK states in its program guide, "standardized pricing for all

customers."  CDK's website makes the same point: "Our philosophy is simple:

standardized pricing for all our Third Party Access vendors."  But as detailed below,

that is not true with respect to MVSC.

92.     CDK has posted a pricing guide on its website that sets forth the

standardized charges for accessing specific types of information from the DMS.  For

the type of information that EVR providers require – buyer, vehicle, and financing

data – the standardized pricing is $49 per dealer per month.

93.     Reynolds's pricing for participating in the RCI program is much more

secretive.  According to current and former Reynolds executives, Reynolds has a

pricing committee (chaired by the company's owner, Bob Brockman) that

determines the rates on a vendor-by-vendor basis.  The pricing information is not

MVSC'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

shared internally at Reynolds – let alone publicly – and even account executives within the RCI program sometimes do not know the rationale for what vendors are charged to particpate.

94.     CDK and Reynolds pay lip service to the fact that dealerships "own their data and enjoy having choices on how best to share and utilize that data." CDK and Reynolds represent that dealers should "choose the vendors with whom [they] want to share data" through the third-party programs. But that is not how it works in reality. Even though California and Illinois dealers want MVSC to participate in the 3PA and RCI programs and despite MVSC's repeated attempts to participate, CDK and Reynolds have entered into an illegal conspiracy to block MVSC from participating in the 3PA and RCI programs.

## III.    CDK, Reynolds, and CVR Have Illegally Agreed To Block MVSC from Participating in the 3PA and RCI Programs

### A.    The Facts of the Agreement Are Straightforward

95.     As of January 2014, CDK and Reynolds had entered into an illegal agreement in which both DMS providers agreed to block MVSC from participating in their third-party access programs. It is likely that the agreement was formed prior to that date, but it was in place at least by January 2014. The agreement continues in effect to this day.

96.     CDK's and Reynolds's identical decisions to block MVSC from their third-party access programs were the function of an agreement between them, not

unilateral decisionmaking. CDK and Reynolds – horizontal competitors in the DMS market – coordinated their actions and agreed that they both would reject MVSC from their third-party programs. CVR was their co-conspirator in the scheme. Indeed, CDK and Reynolds entered into the illegal agreement with CVR's encouragement and participation.

97.     The agreement was formed and implemented by at least the following individuals: Scott W. Herbers, CVR's longtime General Manager who at the same time served in senior executive positions at CDK; Robert N. Karp, President, CDK North America, and the person with oversight of CDK's 3PA program; and Robert Schaefer, Director of Data Services at Reynolds and the person in charge of Reynolds's RCI program.

98.     Scott Herbers is at the nexus of the conspiracy. Not only was he the longtime General Manager of CVR from 2002 until 2015, but he also served as a top executive at CDK during the same period. For example, while running CVR in January 2014, Mr. Herbers was also the CDK Vice President in charge of CDK's western region. Today, Mr. Herbers serves as CDK's Vice President of Sales, North America, while retaining some oversight responsibilities for CVR. Moreover, before taking the helm at CVR, Mr. Herbers was a top executive at Reynolds, serving as Vice President of Sales from 1991 to 2002. Mr. Herbers is therefore at the epicenter of the CDK-Reynolds-CVR triangle. He is also the lead instigator and driver of the collusive behavior.

99. Mr. Karp (CDK) and Mr. Schaefer (Reynolds) have played pivotal roles in implementing the agreement. MVSC has made repeated attempts to participate in the 3PA and RCI programs. On several occasions, lower-level CDK and Reynolds employees promised (or expressed confidence) that MVSC would be allowed to participate in the programs. But, inevitably, when the idea was run up the corporate ladder, those same employees would come back with news that MVSC's applications had been blocked by senior executives – Mr. Karp at CDK and Mr. Schaefer at Reynolds.

100. Based on information from a participant in the collusive conversations, CDK even has a name for the illegal conspiracy – the "Closed Category." EVR is a "Closed Category" within the third-party programs because they are "closed" to MVSC. Instead, CDK and Reynolds agreed to allow CVR – and only CVR – to participate in the programs in the state EVR markets where CVR competes with MVSC.

101. The executives had every opportunity to coordinate and collude, and based on information from participants in those conversations, the executives took full advantage of those opportunities. Mr. Herbers and top executives at CDK and Reynolds sat on CVR's Board of Directors together. During board meetings, MVSC was a recurring topic of conversation. A former CVR board member confirmed that Reynolds and CDK executives were "very involved" and "very knowledgeable about MVSC and everything CVR was doing." Additionally, CVR's headquarters are

36

located in CDK's California offices – they are on the same floors in the same building – and Mr. Herbers and CDK executives frequently discussed MVSC and the need to prevent MVSC from participating in the 3PA and RCI programs. Moreover, any time Mr. Herbers spoke with a Reynolds executive, Mr. Herbers was speaking both as the leader of CVR and a senior CDK executive.

102.   The purpose of the conspiracy is self-evident: (1) protect CVR's monopoly in the Illinois EVR market; (2) empower CVR to regain its monopoly position in the California EVR market; and (3) block MVSC from effectively competing with CVR in markets that MVSC may enter in the future. For CDK and Reynolds, CVR has been a cash cow, generating hundreds of millions of dollars during their ownership. The purpose of the conspiracy is to protect the flow of those profits into the coffers of CDK and Reynolds.

103.   CDK's and Reynolds's collusion did not stop at agreeing to block MVSC from their third-party programs. Senior CDK and Reynolds executives also had illegal pricing discussions regarding their respective 3PA and RCI programs. For example, the CDK and Reynolds executives discussed specific pricing and pricing methodology.

104.   Removing all doubt as to the existence of the conspiracy, a CDK executive has even confirmed to a senior MVSC executive that CDK has agreed "for a long time" to keep EVR as a "closed category" within the 3PA program to keep MVSC out and to protect CVR. He confirmed that it was Mr. Schaefer at Reynolds

who was over the consideration of MVSC for participation in the RCI program. His purpose in calling was to let MVSC know that there were some lower-level executives within CDK who believed the agreement was wrong. They believed MVSC should be allowed to participate in the third-party programs and therefore compete with CVR on a level-playing field. These CDK executives had argued that participation should be offered to everyone equally and the EVR companies should compete on the quality of the product and service. But he said that Mr. Herbers and Mr. Karp had rejected this argument. He ended the conversation by imploring the MVSC executive to contact a specific executive vice president at CDK – Malcolm W. Thorne, CDK's Chief Global Strategy Officer and the company's rumored next CEO – in the hope that he would override Mr. Herbers and Mr. Karp and allow MVSC to participate in the 3PA program. MVSC's efforts in this regard have been to no avail.

## B. CDK and Reynolds Have Enforced the Agreement

105. CDK and Reynolds have been disciplined in their adherence to their illegal agreement. Every time MVSC has applied to participate in the 3PA and RCI programs, MVSC has been told "No."

### 1. CDK Has Repeatedly Refused To Allow MVSC To Participate in the 3PA Program

106. MVSC first applied to participate in CDK's 3PA program in February 2014. MVSC made clear that it needed only basic data from a dealerhip's DMS and

that it would pay the standard rates for the data. On March 14, 2014, CDK rejected MVSC's application without explanation, stating: "You have not been approved for inclusion in the [CDK] Third Party Access Program." MVSC asked the CDK representative multiple times for an explanation and received nothing other than the following statement: "The decision was far above my level."

107. Many dealers wrote to CDK to complain. On May 15, 2014, one wrote: "DMVdesk is our chosen [EVR provider] in the State of California for electronically processing the registration and titles for all of our stores. We understand DMVdesk was denied the opportunity to participate in the program without explanation. We would strongly encourage [CDK] to reconsider this decision and to allow DMVdesk to participate in the program. We have utilized other [EVR providers] and have found DMVdesk to have a superior product and provide us with a higher level of service and support than the other approved [EVR providers]."

108. On May 22, 2014, another dealer wrote CDK: "We currently process our DMV work electronically through our service provider, Motor Vehicle Software Corporation (DMVdesk). We are very happy with the product and service that they provide to all of our stores. It has come to my attention that they applied to participate in the [CDK] Third-Party Access Program, but were denied access. The fact that [CDK] and Motor Vehicle Software Corporation share a common client should encourage you to embrace a business relationship that will ultimately serve us, your end user. We strongly encourage [CDK] to reconsider this decision and to

allow MVSC to participate in the program.  We have used other Service Providers in the past and have found that DMVdesk exceeds our expectations.  If they can bring additional value to us through the [CDK] Third-Party Access Program, then we would like to see it happen."

109.    On July 11, 2014, another dealer wrote CDK regarding its decision to block MVSC: "I am writing to encourage [CDK] to reconsider this decision and to allow DMVdesk to participate in the program as I believe competition in the market place is always good.  When compared to the other [EVR providers] we have used in the past, we have found DMVdesk to best meet [our] needs, while providing us with a high level of service and support."

110.    In July 2014, after being prompted by multiple dealerships, MVSC again applied to participate in CDK's 3PA program.  Citing the letters the dealerships had sent to CDK, MVSC wrote that it was "hopeful that after considering the desires of your customers and the value of having DMVdesk as part of the program that CDK will approve this application."  MVSC also noted the "meaningful financial value to CDK in approving DMVdesk as a vendor," given that MVSC would pay the standardized rates for the data on the DMS.  Finally, MVSC noted that allowing MVSC to participate would support CDK's statement to dealers that "'[d]ealerships own their data and should have choices on how best to share it and use it.  Our Third-Party Access Program lets you [the dealerships] choose the

vendors with whom you want to share data, by providing participating third parties with secure application programming interfaces.'"

111.   The CDK representative that processed MVSC's application wrote that a "first, smaller committee agreed" to allow MVSC into the 3PA program, but that he had to send the application "up the chain."  Once in the hands of Mr. Herbers and Mr. Karp, MVSC's application had no chance.  They overruled the committee's decision and again rejected MVSC's application.  This time, however, MVSC received an explanation for the rejection: CDK stated that MVSC was a competitor to CVR, and it was therefore unlikely that MVSC would ever be allowed to participate in the program.

112.   In March 2015, MVSC again applied to the 3PA program.  MVSC emphasized that it would pay the posted standardized rates for participation.  After MVSC applied and asked for a status update, a CDK representative responded that MVSC's application was "sitting at the highest level of governance that we have" – meaning, with Mr. Karp and Mr. Herbers.  This time, instead of a flat rejection as with the two prior attempts, CDK demanded 33 percent of MVSC's top-line revenue to participate, an extortive demand that would make it impossible for MVSC to operate as a profitable business.  CDK knew that MVSC could not charge dealerships more in order to cover the exorbitant demand.  CDK knew that MVSC would lose money on every CDK dealership that it served, would cease to be able to operate as a going concern, and could never accept the proposal.  MVSC made these

points to CDK, and referred CDK to its public statements that "[o]ur 3PA program pricing philosophy is simple: standardized pricing for all customers." MVSC again stressed that it required only basic information from a dealer's DMS – among the cheapest information to obtain based on CDK's standardized pricing sheet. CDK responded that no matter what it had said publicly, privately MVSC was different because it competed with CVR and so would have to pay the exorbitant rate. CDK knew that no business could pay 33 percent of its top-line revenue to obtain the basic (but necessary) data from the DMS. The requested percentage was an effective refusal to deal, and CDK knew it.

113. In May 2016 – again at the behest of various dealerships – MVSC tried yet again to participate in the 3PA program. On May 2, 2016, MVSC spoke with Dan McCray, Vice President of Product Management at CDK. Mr. McCray stated that vendors "should be able to integrate with the DMS even if they have products that compete with companies owned by CDK." Mr. McCray also said that the standardized pricing posted on the 3PA website is what MVSC would pay if it wanted to participate. MVSC stated that it had always been willing to pay the posted rates. Therefore, with the apparent change of heart from CDK, MVSC applied the very next day to participate in the 3PA program. After a week had passed, MVSC contacted Mr. McCray for a status update. On May 12, 2016, Mr. McCray responded: "I learned a lot since the last time we talked. I see this is not going to be [an] easy decision." Mr. Herbers and Mr. Karp had intervened. Indeed, Mr. McCray

stated that CDK had "elevated your 3PA integration discussions." Then, as it had before, CDK quoted MVSC a similarly offensive percentage of MVSC's top-line revenue as the price of participation – this time 25 percent of MVSC's gross revenues. And as before, MVSC explained to CDK that the quoted price was an effective refusal to deal, as MVSC could not raise its rates to cover the huge fee. MVSC would still lose money on every CDK dealership. To break even, MVSC would have to lay off over half of its staff; cease all research and development efforts; and end multiple partnerships with car dealer associations. Even then, such cuts would most likely not be enough. CDK understood that, and once again, it knew that the quoted price was an effective refusal to deal.

114. In September 2016, MVSC applied again to participate. This time, MVSC attached with its application CDK's "standardized" price list for all vendors in the 3PA program. On September 13, 2016, CDK responded that the publicized pricing did not apply to MVSC, and that there would be "no change to the pricing" that CDK had presented previously. For MVSC, "the integration pricing is still 25 percent of the revenue generated." CDK openly admitted that MVSC's pricing was so high because CDK and Reynolds "have a competing product in the market" – namely, CVR.

115. With CDK's refusal to deal causing continued disruptions, dealerships again encouraged MVSC to apply to the 3PA program. And so on October 21, 2016, MVSC wrote to CDK: "We have tried numerous times [to participate in the 3PA

program] and we have been told we can't participate and were quoted a price that far exceeds that which is published on the website and [which is] economically unfeasible."  CDK offered no substantive response.

### 2. Reynolds Has Repeatedly Refused to Allow MVSC to Participate in the RCI Program

116.   MVSC first applied to participate in Reynolds's RCI program in early 2014.  In response, Reynolds refused to provide a price quote until MVSC provided detailed information about MVSC's business.  Reynolds's aim was to extract as much proprietary information from MVSC as possible before providing firm pricing. Such information included details regarding MVSC's future business plans in California and Illinois, as well as technical information on how MVSC internally used and processed the data pulled from the DMS.  Finally, in February 2014, Reynolds came back with a price quote that translated into a huge percentage of MVSC's top-line revenues, similar to CDK's demand.  If paid, the cost of accessing the DMS would require MVSC to operate at steep losses, which would therefore make the business no longer viable.  Like CDK, Reynolds knew that the quoted price was an effective refusal to deal.

117.   At the urging of several dealerships, MVSC applied again in August 2014.  This time, Reynolds provided a quote that was actually higher than the one provided in February.  Reynolds stated that a senior-level "pricing committee" had mandated that MVSC be quoted the even higher rate.  The rate was exorbitant, and

MVSC informed Reynolds that the proposed pricing would effectively eliminate MVSC's ability to serve dealerships that use the Reynolds DMS. Moreover, MVSC explained that the data it required from the DMS was basic information that in no way justified the inflated rate. "To be clear," MVSC wrote to Reynolds, "our desire is to participate in the RCI program, but financially it is impossible for us." Reynolds responded that the quoted rate would not change and therefore terminated the discussions regarding MVSC becoming RCI certified.

118. In 2016, while at an industry conference, an MVSC executive complained to a CVR executive about how absurd the quoted rates were. In response, the CVR executive confirmed that the quotes were not serious and were simply designed as an effective refusal to deal. The CVR executive stated: "*I wish we would have asked for 85 percent of your revenue. We don't want you in the program.*"

### C. There is Clear Evidence of the Agreement in the Marketplace

119. The illegal conspiracy reveals itself in obvious ways in the various state EVR markets. For example, MVSC and CVR do not compete in the Oregon EVR market. And yet, CDK and Reynolds still do not allow MVSC to participate in their third-party programs, even within the limited Oregon market.

120. Standing in stark contrast is the Texas EVR market, where neither CVR nor MVSC operates due to Texas's byzantine regulation of EVR services at the county (rather than the state) level. In Texas, CDK and Reynolds both allow the

local EVR provider (AIB, Inc.) to participate in their third-party programs. AIB operates only in Texas and poses no competitive threat to CVR. Compare that with Oregon, where MVSC is the local EVR provider: CDK and Reynolds both bar MVSC from participating. CDK and Reynolds therefore treat AIB (a non-competitor to CVR) one way, and MVSC (the chief competitor to CVR in California) another way. As these on-the-ground facts demonstrate, CDK and Reynolds are targeting MVSC.

121. The California and Illinois EVR markets remove all doubt. Those are the markets where MVSC and CVR compete head-to-head. In those states, CVR is the *only* EVR provider allowed to participate in the 3PA and RCI programs. Therefore, in those markets where CVR competes with MVSC, CDK and Reynolds give CVR special protection by refusing to allow MVSC and other EVR providers to participate.

122. Finally, other DMS providers – the ones that do not own CVR – allow MVSC to participate in their third-party programs. These DMS providers – although minor and comprising a small percentage of the dealership market – include Dealertrack and Advent. It is only CDK and Reynolds – the owners of CVR and the two dominant DMS providers – that refuse to allow MVSC to participate.

**IV. CVR Is Maintaining Its Monopoly Position in the Illinois EVR Market**

123. Because CDK and Reynolds refuse to allow MVSC to participate in their third-party programs, MVSC is unable to compete with CVR in the Illinois

MVSC'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

EVR market. Participation in the third-party programs with instantaneous access to a dealer's DMS is a pre-requisite to competing in Illinois. Without it, an EVR provider cannot obtain the necessary information in real time in order to process the registration and tags for the car buyer at the point of sale. CVR – as the only EVR provider in Illinois allowed to participate in the 3PA and RCI programs – is therefore guaranteed to maintain its monopoly position with over 95 percent of the market.

124. EVR providers other than MVSC are likewise unable to break CVR's monopoly in Illinois. For example, although Dealertrack has operated in Illinois for many years, it has not been able to compete with CVR.

125. If MVSC was allowed to participate in the 3PA and RCI programs, and therefore have real-time access to the DMS data, then MVSC would be able to compete against CVR in the Illinois EVR market. And if MVSC was allowed to compete against CVR, then CVR's monopoly would no longer be secure.

126. CDK and Reynolds are liable for CVR's monopolization of the Illinois EVR market because they control the management and decisionmaking of CVR. Moreover, the only reason CVR is able to maintain its monopoly in Illinois is because CDK and Reynolds have blocked MVSC and other EVR providers from participating in the 3PA and RCI programs.

## V.   CVR Is Attempting To Monopolize the California EVR Market, and There Is a Dangerous Probability that It Will Succeed

127.   CVR once had a monopoly in the California EVR market, controlling virtually the entire market.  But due to MVSC's dedication to quality product and services, MVSC has been able to make inroads into MVSC's dominant market position.

128.   CVR, CDK, and Reynolds are attempting to regain CVR's monopoly position in California through a multi-front campaign.  First, CVR is leveraging its position as the only "certified" EVR provider in the state, making good on the purpose behind CDK's and Reynolds's group boycott of MVSC.  Second, CDK and Reynolds are cutting off MVSC's alternative paths to obtain the necessary data from dealerships' DMS.  This, more than anything, risks reinstating CVR's monopoly.  And finally, CDK and Reynolds are contacting MVSC's dealerships directly, using all the leverage they possess to coerce dealerships to switch to CVR.  Despite their preference for MVSC, many dealers are in fact making the switch in the face of Defendants' actions.  As a result, there is a dangerous probability that CVR will succeed in regaining its monopoly position.

### A.   CVR Is Leveraging Its Position as the Only EVR Provider To Convince Dealerships To Switch from MVSC

129.   In California (as elsewhere), CVR has leveraged its position as the only EVR provider allowed to participate in the 3PA and RCI programs.  CDK and

Reynolds worked in concert with CVR to capitalize on its exclusive status as the only "certified" EVR provider.

130.    CVR has aggressively sought to use its exclusive DMS access to its advantage.  In one typical correspondence, CVR wrote to MVSC's dealers that "it's critical your dealership is utilizing a 'certified' service provider for computerized vehicle registration.  Utilizing an uncertified service provider is exposing your DMS customer data to unnecessary risk and liability.  For a limited time, CVR, *the industry's only 'certified' service provider*, is offering special incentives to *drop your uncertified service provider* and instantly switch to CVR.  Be prepared, be safe, switch to CVR!" (emphasis added).

131.   This email from CVR was immediately followed by an email from CDK, which specifically targeted MVSC's product as not being certified.  "Your current DMV vendor 'DMV Desk' is not certified – please see the message below from our CVR representative about the risks from that.  It's possible to have [CVR] call you and in 10 minutes [we'll] get you switched over to CVR's 'certified' system. . . . It just makes no sense to entrust the security of your DMS data to an uncertified service provider."

132.   After CDK sent its email, CVR sent yet another email to MVSC's dealerships, writing: "*We are simply stating the fact that CVR is the industry's only service provider that has 'certified integration' with your [CDK] DMS.  That means CVR pulls data securely and directly from your [CDK] DMS, as opposed to all our*

competitors, including DMV Desk, *which access your [CDK] DMS via a hostile interface*." (emphasis added).

133. While some dealers saw through CDK's actions for what they were – scare tactics – many other dealers switched.

## B. CDK and Reynolds Are Seeking To Completely Cut Off MVSC's Access to the Necessary Data on a Dealer's DMS

134. CVR's ability to market itself as the only "certified" EVR provider in California is an obvious advantage. But even worse, CDK and Reynolds are now engaged in a crusade to eliminate MVSC's last remaining ways to obtain the necessary data for a dealer's DMV. CDK and Reynolds have agreed to block MVSC from accessing the data by any means, whether through the third-party programs or otherwise.

135. Because CDK and Reynolds can utilize their power in the DMS market to prosecute their crusade to eliminate any avenue for MVSC to obtain the necessary data, there is a dangerous probability that CVR will illegally regain its monopoly position in the California EVR market.

### 1. CDK and Reynolds Have Cut Off MVSC's Ability To Obtain the Necessary Data from a Dealer's DMS Through Intermediaries

136. At one time, MVSC was able to obtain the required data from a dealer's DMS through intermediaries. The intermediaries helped dealers manage the data flow for the many third-party vendors that required access to information from the

MVSC'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

dealer's DMS in order to provide important services. The vendors, such as MVSC, would pay the intermediaries a fee to access the required data from the dealer's DMS. CDK and Reynolds tolerated this situation for a time. But in an effort to increase revenues, and despite loud protests from dealers, CDK and Reynolds have engaged in a campaign to destroy the intermediary market and cut off intermediary access to their DMS platforms. In that way, they are forcing third-party vendors to participate in their 3PA and RCI programs. But, as described herein, CDK and Reynolds do not allow MVSC to participate in the third-party programs. They have therefore eliminated the most viable remaining path for MVSC to obtain the required data from a dealer's DMS.

### a. Reynolds Eliminated Intermediary Access

137. Reynolds was the first to cut off MVSC's access through intermediaries. Until 2014, MVSC was able to obtain data from the Reynolds DMS through an intermediary called Authenticom. But Reynolds cut off that route. As one large dealership explained to MVSC, "Reynolds was seeking to 'choke' all 3rd party efforts to integrate directly with Reynolds to extract data. I have watched several 3rd parties literally be choked until they die and the companies are no more. Authenticom is exactly the type of company Reynolds is trying to choke off." Reynolds succeeded in cutting off MVSC's access to a dealer's DMS through Authenticom or any other intermediary, and therefore eliminated MVSC's ability to obtain the necessary data through intermediaries.

### b. CDK Eliminated Intermediary Access

138.   With respect to CDK, MVSC was once able to access the CDK DMS through three intermediaries – Authenticom, ProQuotes, Inc., and Superior Integrated Solutions, Inc. ("SIS").  But like Reynolds, CDK has systematically cut off that pathway.

139.   CDK first cut off Authenticom.  In August 2016, Authenticom notified dealers that its access to the CDK DMS was being "disabled by CDK thus prohibiting our ability to extract data for your solution providers.  This functionality is similar to the lockouts you may have heard about that we experienced with Reynolds & Reynolds in the past."  Dealers immediately contacted MVSC to express their anger at CDK, complaining that their EVR service was being interrupted and they could not process the required information.  For example, one large dealer wrote: "Shut down again!  What the heck happened, thought you were going to access using [Authenticom]?  Please advise ASAP!"  When investigating the reason for the shutdown, the dealership discovered that CDK was preventing the data from being transferred to MVSC.

140.   In the fall of 2016, CDK also cut off MVSC's access through ProQuotes.  As one dealer explained, "DMVDesk accesses through ProQuotes at this time and that access will cease soon, as CDK will not allow them into our [DMS]."  At the time of CDK's actions, MVSC served over 100 dealerships that were impacted by the termination of access through ProQuotes.

141.   Finally, CDK cut off MVSC's access through SIS.  On August 30, 2016, SIS informed MVSC by letter that it "must terminate" its "integration offerings" with the CDK DMS.  "SIS will terminate the portion of the current Agreement with [MVSC] that pertains to providing integration services with the CDK DMS, effective January 1, 2017."  CDK coerced SIS to take this drastic step.  At the time of the letter, MVSC served 127 California dealerships that would be impacted by the termination.

142.   Next, CDK sent a follow-up letter directly to MVSC's dealers on November 15, 2016.  The letter begins, "We are writing to inform you that Superior Integration Solutions (SIS) will no longer, as of December 31, 2016, provide DMVdesk with integration to the CDK DMS."  The letter then contains the following falsehood: "CDK attempted to reach agreement with DMVdesk to have its product integrated through CDK's Third Party Access program – the only CDK approved method of third party integration.  However, DMVdesk recently informed us that they have declined to participate in the Third Party Access program."  CDK knew this statement was untrue.  As detailed above, it was CDK that had rejected MVSC's multiple attempts to participate.  Nonetheless, CDK deceived MVSC's dealerships, misrepresenting that it was MVSC's choice not to participate.

143.   A CDK executive specifically warned MVSC that CDK was not "bluffing" and that CDK would "turn off" MVSC's access to the SIS dealerships.

### 2.    CDK and Reynolds Are Trying To Eliminate MVSC's Only Remaining Route for Obtaining Data from a Dealer's DMS

144.    With CDK and Reynolds having blocked MVSC from their third-party programs and then having cut off any intermediary access, MVSC has one last option for obtaining data from a dealer's DMS: a manual process that requires the dealer to pull the data every day.  On a daily basis, the dealer runs a script that creates a report containing the required data to process EVR transactions.  The report is placed in a folder on the dealership's local hard drive.  The report is then encrypted and transferred to MVSC using the highest security standards.  Once transferred, the report is automatically deleted from the dealership's hard drive.

145.    Because of MVSC's preferable product and service, many dealers are willing to complete the manual steps to retrieve the necessary data from their DMS.  But CDK and Reynolds have conspired to put a stop to this, too.

146.    First, for some dealers, CDK and Reynolds are disabling the script so that the dealer cannot create the report with the DMS data.

147.    Second, and even more importantly, CDK and Reynolds are using the most powerful weapon in their arsenal: the DMS contract.  CDK and Reynolds are threatening dealers by telling them that they are in breach of their DMS agreement by using the manual process to retrieve data from the DMS.  Given the importance of the DMS to the functioning of a dealer's business, and the disruption that CDK and

Reynolds can cause if they pursue a claim of breach, it is hard to overstate the impact that such threats have on dealers.

148.   Moreover, this is not the first time CDK and Reynolds have used the DMS contract as a weapon to threaten MVSC's dealers.  Throughout the past year, CDK and Reynolds have repeatedly threatened MVSC's dealers that they are in breach of their DMS contract by providing data to MVSC through any means other than through the 3PA and RCI programs (from which MVSC is blocked).  It is a trump card that CDK and Reynolds repeatedly use to intimidate dealers in order to block MVSC from gaining the data required to provide EVR services.

149.   CDK and Reynolds have threatened dealers directly.  Dealerships have reported that CDK and Reynolds representatives have visited their stores and called on the phone to warn them that by using the manual process for MVSC, the dealerships have created a "hostile integration" and are therefore in breach of the DMS contract.  Notwithstanding that any such claim of breach is baseless, and that it is undisputed that the dealers own the data stored on the DMS, the dealers have no choice but to take the threat seriously.

150.   CDK and Reynolds have also threatened dealers indirectly, warning them that any "unauthorized" access to the DMS (i.e., any access other than through the 3PA and RCI programs) must be eliminated by the end of 2016.  For example, CDK is sending emails to dealers with "non-authorized activity reports" that detail when data is retrieved from a dealer's DMS through an avenue other than the 3PA

program. CDK has accompanied the reports with a warning that "non-authorized access presents a number of data security risks, including lack of controls on what data can been accessed." Dealers are contacting MVSC when they receive these reports. One dealer wrote in typical fashion: "[We] received another notice from CDK today that we are allowing unauthorized access to our data to an unapproved vendor."

151. Mr. Karp (CDK) – the co-conspirator with Mr. Schaefer (Reynolds) and Mr. Herbers (CVR) – has even contacted dealers directly. On August 22, 2016, Mr. Karp sent a letter to California dealers served by MVSC with the following message: "We are contacting you because your dealership has been identified as a client of a third party that is accessing your data through CDK systems by unauthorized means." He stated that "[o]ur goal is to complete the removal" of "unauthorized third-party access methods by December 31, 2016." Mr. Karp then wrote: "Vendors that wish to continue accessing DMS data should therefore begin the Third Party Access program application process immediately to avoid disruption." This statement is a farce: CDK refuses to allow MVSC participate in its 3PA program. Mr. Karp ended his letter with a final threat to the dealers: "In January, CDK will further increase our security actions to prevent the use of unapproved data access methods." Beyond what CDK is already doing, therefore, CDK has threatened to tighten the vise even further in 2017. CDK's goal is plain: to ensure that MVSC has

no way to obtain the necessary data from a dealer's DMS, choking off MVSC's

business and eliminating CVR's chief competitor in California.

### C. CDK and Reynolds Are Contacting Dealerships Served by MVSC To Pressure Them into Switching to CVR

152.    In conjunction with their efforts to completely cut off MVSC's access to

the necessary DMS data, CDK and Reynolds have contacted California dealers to

convince them to switch to CVR. The pattern is now familiar: cut off MVSC, and

then push dealers to switch to CVR. And as part of that push, CDK and Reynolds

have spread disinformation and falsehoods about MVSC.

153.    For example, throughout October 2016, CDK called dealerships served

by MVSC and told them that CDK would be "turning off MVSC at the end of the

year because MVSC has refused to participate in the 3PA program." The truth was

the opposite: CDK denied access to MVSC. The CFO of another large dealership

called MVSC to say that "an executive regional sales manager from CDK personally

called me to say that DMVdesk has not renewed an agreement with CDK" – another

falsehood – "and that they will no longer support the DMVdesk connection to

CDK." The CDK salesperson also informed the dealership that he had contacted

"about ten other CFOs from other large dealer groups to inform them" of the same.

154.    A typical example of CDK's strongarm tactics involved a dealership

from the Los Angeles area. CDK had cut off MVSC's ability to retrieve data from

the dealer's DMS. The dealer called CDK. CDK responded that MVSC was not

authorized to obtain data from the DMS system and that the dealer should switch to CVR "to avoid this issue." In another representative example, a Sacramento dealer reported to MVSC that she had "received a call from her CDK rep this morning [who] said that she would no longer be able to use DMVDesk after November 30th." The CDK representative had informed the dealer that MVSC "would no longer be compliant" and that the dealer should therefore switch to CVR.

155. Dealerships confirmed that CDK and Reynolds are using the same tactics. "Am a little surprised that CDK is beginning to sound like Reynolds," one dealer wrote to MVSC. "CDK has been in here telling me they want us to convert."

156. On or around October 25, 2016, CDK sales representatives had a meeting in Denver, Colorado, where they were further instructed about the campaign to cut off MVSC and convert dealerships to CVR. In fact, while the CDK sales representatives were at the company meeting, they called dealers served by MVSC to reiterate that MVSC would be cut off. These sales representatives repeated – yet again – the false claim that MVSC had refused to participate in the 3PA program. The sales representatives emphasized that the dealers needed to switch to CVR, which they stressed was the only EVR provider with direct access to data on the DMS. They told dealers that they knew how MVSC was obtaining the data – through the manual workaround – and that CDK was going to find a way to shut off that pathway (which, as noted above, included threatening the dealers with breach of the DMS contract). On one of those phone calls, a CDK salesperson confirmed

(after being asked by the dealer) that CDK sales personnel were gathered together in Denver and that the campaign against MVSC on behalf of CVR was a key part of their meeting's agenda.

**D.      Dealers Have Responded to CDK's and Reynolds's Tactics in Various Ways, Including by Switching to CVR**

157.   Unfortunately, for many dealers, the campaign by CDK and Reynolds to cut off MVSC and then convert dealerships to CVR has had its intended effect. Inevitably, after CDK or Reynolds sent a letter or contacted a group of dealers, MVSC would receive a flood of calls and emails from concerned dealers, with many making the decision to switch to CVR.

158.   "I have really bad news," one dealer wrote.  "We are not going to be able to keep DMVDesk since CDK is only approving CDK Licensed approved vendors to have access to our CDK files."  Another asked, "how much notice do we need to give if we go with CVR?"  The decision to switch was "coming from the owner because of what CDK is telling them."  Another wrote, citing CDK's communications: "This is a 30-day notice that our Company has made the decision to not continue using DMV Desk as our source of completing the DMV process for our Customers.  This decision was not made lightly.  We feel it is the best decision for our Company at this time."  Another summed up the general response of dealers deciding to switch: "We finally received the [CDK] letter, and as per our owner we have decided to go a different direction.  I apologize for the inconvenience please let

us know what the next steps are to cancel our service with you. *By no means is it anything that has to do with your service, we just think it is smarter to go with a company that works closely with the DMS we use daily.*" (emphasis added).

159. Other dealers, while not yet having made the decision to switch, have expressed serious apprehension. "Help!" one dealer exclaimed. "Where do we go from here??" Another asked, "DMV Desk going away? Per the attached notice from CDK, they won't be allowing DMV Desk to integrate with CDK as of 12/21/16." Another wondered if there was anything MVSC could do: "Please see attached letter from CDK. They are not going to give you access to our customers' files. They want us to change registration companies. Please let me know if there is anything you can do." One industry leader summarized the general feeling: "CDK has the owner and GMs all worried. . . . CDK has really gotten in everyone else's head."

160. The California New Car Dealers Association has even had to get involved. Representing over 1,100 dealers, it is the country's largest state association of franchised new car dealers. Many car dealers contacted the Association to express their frustration with CDK and Reynolds. Commenting on one especially sophisticated dealership, the Association's president wrote to MVSC: "My concern is he is one of the most knowledgeable dealers we have in the state and he is concerned; I can't imagine the impact their tactics might be having on less informed dealers."

MVSC'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

161.   If there is one overriding response from dealers to CDK's and Reynolds's actions, it is anger.  The dealers are up in arms.  By cutting off MVSC, Defendants are disrupting the dealers' business.  They are preventing dealers from ensuring that car buyers, as required by California law, receive their registration and license plates within 90 days of the purchase date.  As reported by one industry participant, the primary dealer response to Defendants' tactics is "outrage and resentment."

**E.     To the Extent MVSC Has Been Able To Retain Dealerships, It is Because of MVSC's Superior Product and Service**

162.   The dealers that have remained with MVSC point to MVSC's superior product and service as their reason for staying.  "CDK has been in here telling me they want us to convert," one dealer informed MVSC.  "They did not tell me how they are playing hard ball with the vendors.  Either they have a third-party access program or they don't.  They should not be selective.  As their client, I should still have the right to pick and choose.  We are happy with DMVDesk and we are getting the job done."  Similarly, another dealer wrote MVSC: "We have absolutely NO issues with your company, all I want, is to make sure our . . . service remains up to the current standard that we are used to."

163.   Other dealers have been more direct in calling out Defendants' tactics.  One dealer told CDK: "You are turning off MVSC just because you are trying to get your inferior product from CVR back in here, aren't you?"  Another dealer delivered

the same message: "You are calling me just trying to get your inferior product back in here. Not happening." One dealer denounced CDK for its "scare tactics," writing: "We're comfortable with DMV Desk and CVR didn't give us the service we currently experience."

164. The California New Car Dealers Association has made clear to its members that MVSC offers a far superior product and service than CVR. For example, after one dealer expressed fear about MVSC being cut off from CDK's DMS, the president of the Association responded: "In the sense that CVR is an approved vendor by DMV, yes they can replace DMVdesk, but in terms of service, product improvement and innovation . . . there is no comparison. As you'll recall, a significant reason for our switch of licensed vendors from CVR to DMVdesk in 2014 was the poor quality of service provided to our dealers." The Association told another dealer that while it "is in no position to tell dealers whom to use for any product, including DMS or electronic vehicle registration, we stand behind DMVdesk and believe their product and service to be superior to other EVR providers."

165. Even though many dealerships have remained with MVSC because of its superior service, other dealerships have chosen differently, deciding to switch as a result of Defendants' anticompetitive conduct. Even more serious, if CDK and Reynolds succeed in completely cutting off MVSC's access to dealers' DMS, then

not even superior product and service will be able to save MVSC. In that instance, CVR's return to a monopoly position in California is assured.

## VI.   MVSC Has Suffered Antitrust Injury

166.   Defendants' anticompetitive conduct has directly and significantly damaged MVSC. As a direct result of Defendants' conspiracy to block MVSC from the 3PA and RCI programs; their conspiracy to block MVSC from accessing DMS data at all; and CVR's monopolization of the Illinois EVR market and attempted monopolization of the California EVR market, MVSC has been directly damaged. For example, MVSC has substantially fewer customers than it otherwise would have. This has had a direct, negative impact on MVSC's financial position. While the precise amount of MVSC's damages will be proven at trial, MVSC's damages exceed many millions of dollars.

## VII.   Defendants' Actions Have Harmed Competition

167.   Defendants' anticompetitive conduct has not just harmed MVSC, it has harmed competition itself. First, in concentrated markets, injury to a competitor harms not just that competitor, but competition generally. In the Illinois EVR market, CVR is effectively the only EVR provider with 95 percent market share. By eliminating the ability of MVSC to compete in that market, Defendants have harmed competition. Similarly, in California, after CVR acquired AVRS, there are now only three EVR providers left. Because Defendants' anticompetitive conduct is causing

serious harm to MVSC in the concentrated California EVR market, competition has been harmed.

168.   Second, Defendants' actions have harmed innovation and the quality of the products and services in the marketplace.  Because states regulate output and price of EVR services, EVR providers must compete on quality.  But by propping up an inferior product, and trying to eliminate a superior one, Defendants are hindering innovation.  By reducing the quality of the EVR product and services in the marketplace, Defendants' actions have resulted in an increase in the quality-adjusted price of those services.  That is significant harm to competition and the market.

169.   Third, Defendants' actions have harmed car dealerships.  At a fundamental level, Defendants are restricting dealership choice.  Dealerships prefer using MVSC because of its superior product and service, but Defendants are impeding and thwarting dealerships from exercising that choice.  For example, because of Defendants' conduct, dealerships in Illinois have only one option for EVR services, and that option – CVR – offers an inferior product and service. Furthermore, in California, Defendants' actions have interrupted the provision of a critical (and legally required) service.  Indeed, by cutting off MVSC, Defendants have even put the dealerships' business licenses at risk.  California law requires that a car buyer receive the vehicle's registration and tags within 90 days of purchase. Dealers are responsible for complying with that rule, and if they do not, their business licenses can be revoked.  By interrupting a dealer's EVR service – and

forcing dealers to switch to CVR, which has months-long delays in providing registrations and license plates – Defendants have jeopardized dealerships' licenses.

170.   Fourth, Defendants' actions have harmed car buyers.  In California, it takes CVR up to two months to provide the physical registration and license plates.  MVSC turns around the same in one day.  The difference speaks for itself.

171.   Finally, Defendants' actions have harmed the DMV and frustrated the government's purpose in fostering competition.  Defendants have eliminated competition in Illinois.  They are trying to eliminate competition in California, and there is a dangerous probability they will succeed.  Defendants are also foisting an inferior product and service on the states' dealerships and citizens, which is contrary to the very purpose the states established their EVR programs in the first place.

172.   The California New Car Dealers Association summed it up best in multiple messages to its member dealers.  CDK's and Reynolds's "conduct as it relates to the [EVR] program [is] troubling not only from a business perspective but also from the damage it could do to consumers and the DMV for the roadblocks it is creating in the vehicle registration process itself."

173.   In another message to its members, the Association wrote: "Note that the ONLY potential advantage that CVR has over DMVdesk is integration with CDK's (and Reynolds's) DMS systems.  While DMVdesk can provide the same level of service to dealers (and continues to innovate to provide more functionality) this is a short term, anticompetitive strategy by CDK to attempt to 'lock out'

DMVdesk.  We are researching this DMS access issue from both a legal and political standpoint because it has serious ramifications far beyond the current 'bullying' tactics of CDK to exclude DMVdesk."

## VIII.  Defendants' Anticompetitive Conduct Has No Pro-Competitive Justification

174.   There are no procompetitive justifications for Defendants' conduct.  The only purpose behind their conspiracy to boycott MVSC and campaign to cut off MVSC completely from DMS data is to protect CVR's monopoly profits in Illinois and regain them in California.  Defendants' conduct does not reduce price, increase output, or improve quality.  On the contrary, Defendants' conduct suppresses innovation, decreases quality in the EVR market, and increases the quality-adjusted price of EVR services.

175.   Defendants have argued to dealers that CVR is "more secure" because it has direct access to the DMS platforms.  By extension, Defendants have claimed that MVSC is "unsecure" and poses a threat to the dealers' data security.  Even if that were true – and it is not – that does not justify CDK and Reynolds boycotting MVSC.  Instead, if they cared about security and if direct access really was more secure, then CDK and Reynolds would let MVSC participate in their third-party programs.  If CDK and Reynolds are to be believed, security is a reason to let MVSC in, not keep it out.

176.   In any event, the "security" argument is just a pretext.  As described by industry insiders, the argument "is nothing more than a fear tactic deployed by CDK."  MVSC maintains the highest-level security with respect to all sensitive, confidential data.  The confidential information EVR providers require relate to a car buyer's identification information, including name, address, date of birth, and driver's license number.  The state of California mandates strict protections for this data, and MVSC exceeds the state's requirements.  The security levels maintained by MVSC are even higher than those used by the most secure DMS.  For example, for transferring the data from the dealer's hard drive to DMVdesk, MVSC uses the highest encryption protocol available to civilian organizations – the only higher protocols are reserved for the U.S. military.  Not only does MVSC have internal audits of its data security, but it has regular external audits as well.  MVSC has passed every security audit without a blemish.  MVSC has never had a data breach.

177.   In the end, a CDK executive has confirmed to MVSC what the industry knows: Defendants' argument with respect to "security" is a pretext in order to coerce third-party vendors into the third-party programs.  The CDK executive acknowledged that the rhetoric around "security" has little credibility.  The difference with respect to MVSC is that, no matter the "security" arguments, CDK and Reynolds have agreed to never allow MVSC to participate in their third-party programs.

MVSC'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

**FIRST CAUSE OF ACTION**
**VIOLATION OF SECTION 1 OF THE SHERMAN ACT**
**(all Defendants)**

178.   MVSC incorporates by reference the preceding allegations.

179.   CDK and Reynolds, and their co-conspirator CVR, entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

180.   The conspiracy consisted of a continuing agreement, understanding, or concerted action between CDK and Reynolds – who are horizontal competitors of one another – and their co-conspirator CVR, in furtherance of which they agreed to block MVSC from their third-party DMS programs and cut off MVSC's access to obtain the necessary DMS data by other means.  Defendants' conspiracy is a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade and commerce.

181.   The purpose of Defendants' conspiracy was and is to drive MVSC out of the California EVR market and prevent MVSC from competing with CVR in the Illinois EVR market, thereby protecting and increasing the flow of monopoly profits from CVR to CDK and Reynolds.

182.   Defendants' conspiracy, which amounts to a group boycott, was intended to harm interstate commerce, and it has had an actual, substantial effect on interstate commerce.

183.   Through their conspiracy, Defendants have caused actual injury to competition in both the California EVR market and the Illinois EVR market.

184.   The boycott is cutting off MVSC's access to a facility – DMS data – that MVSC needs in order to compete with CVR in the California and Illinois EVR markets.

185.   CDK and Reynolds possess a dominant position in the DMS market, which they have utilized to further the conspiracy.

186.   Defendants' conspiracy and anticompetitive conduct in furtherance thereof do not enhance efficiency or competition in the California and Illinois EVR markets.  On the contrary, Defendants' conduct has produced only anticompetitive effects in these markets.

187.   As a direct and proximate result of Defendants' unlawful conduct, MVSC has suffered injury to its business or property.  MVSC is entitled to treble damages for the violations of the Sherman Act alleged herein.

**SECOND CAUSE OF ACTION**
**MONOPOLIZATION OF THE ILLINOIS EVR MARKET IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT**
**(all Defendants)**

188.   MVSC incorporates by reference the preceding allegations.

189.   Defendants CDK, Reynolds, and CVR have unlawfully monopolized the Illinois EVR market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

MVSC'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

190.   CDK and Reynolds own CVR and control its management and activities.

191.   CVR possesses monopoly power in the EVR market in Illinois, where CVR has a market share exceeding 95 percent.

192.   CDK and Reynolds have the demonstrated ability to exclude competitors from the Illinois EVR market by denying them participation in the 3PA and RCI programs.

193.   CVR and its parents have willfully acquired and maintained their monopoly power in the Illinois market through anticompetitive means, including by engaging in a group boycott of MVSC.

194.   Through their monopolization of the Illinois EVR market, CDK, Reynolds, and CVR have harmed competition.

195.   As a direct and proximate result of Defendants' unlawful conduct, MVSC has suffered injury to its business or property.  MVSC is entitled to treble damages for the violations of the Sherman Act alleged herein.

### THIRD CAUSE OF ACTION
### ATTEMPTED MONOPOLIZATION OF THE CALIFORNIA EVR MARKET IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT
### (all Defendants)

196.   MVSC incorporates by reference the preceding allegations.

197.   Defendants CDK, Reynolds, and CVR have unlawfully attempted to monopolize the California EVR market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

198.   CDK and Reynolds own CVR and control its management and activities.

199.   CDK, Reynolds, and CVR specifically intend to monopolize the California EVR market.  Their specific intent to monopolize is apparent from their array of anticompetitive conduct that lacks any legitimate business justification.  They conspired to block MVSC from their third-party DMS programs and cut off MVSC's access to obtain the necessary DMS data by other means, including through intermediaries and manual workarounds.

200.   CVR has a dangerous probability of achieving monopoly power in the California EVR market, where it once had a monopoly and currently controls 40 percent of the market.  Most importantly, CDK, Reynolds, and CVR are attempting to block MVSC from obtaining the data necessary to compete in the EVR market.  Moreover, the EVR market in California is concentrated, with a recent trend toward further consolidation; CVR benefits from nationwide economies of scale and exclusive direct access to DMS data; and potential new entrants to the California EVR market face extensive legal licensing requirements and high capital costs.

201.   Through their attempted monopolization of the California EVR market, CDK, Reynolds, and CVR have harmed competition.

MVSC'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

202.   As a direct and proximate result of Defendants' unlawful conduct, MVSC has suffered injury to its business or property.  MVSC is entitled to treble damages for the violations of the Sherman Act alleged herein.

## FOURTH CAUSE OF ACTION
## CONSPIRACY TO MONOPOLIZE THE ILLINOIS AND CALIFORNIA EVR MARKETS IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT
## (all Defendants)

203.   MVSC incorporates by reference the preceding allegations.

204.   Defendants CDK, Reynolds, and CVR have unlawfully conspired to monopolize the Illinois and California EVR markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

205.   Defendants CDK, Reynolds, and CVR have a common purpose to monopolize the Illinois and California EVR markets and have committed multiple overt acts in furtherance of that conspiracy.

206.   Defendants CDR, Reynolds, and CVR have a specific intent to monopolize the Illinois and California EVR markets, as shown by their anticompetitive conduct that lacks any legitimate business justification.

207.   CVR has monopoly power in the Illinois EVR market and a dangerous probability of achieving monopoly power in the California EVR market.

208.    CDK and Reynolds own CVR and control its management and activities.

209.   Through their conspiracy to monopolize the Illinois and California EVR markets, CDK, Reynolds, and CVR have harmed competition.

210.   As a direct and proximate result of Defendants' unlawful conduct, MVSC has suffered injury to its business or property.  MVSC is entitled to treble damages for the violations of the Sherman Act alleged herein.

**FIFTH CAUSE OF ACTION**
**DENIAL OF ESSENTIAL FACILITY IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT**
**(all Defendants except CVR)**

211.   MVSC incorporates by reference the preceding allegations.

212.   Defendants CDK and Reynolds have unlawfully denied MVSC access to an essential facility in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

213.   CDK and Reynolds are monopolists over the essential facility of access to the data on their DMS platforms.  CDK and Reynolds are the exclusive gatekeepers to their DMS platforms.  MVSC cannot reasonably or practically duplicate the CDK or Reynolds DMS platforms, or the data on those platforms.

214.   CDK and Reynolds have refused to provide MVSC with reasonable and nondiscriminatory access to the data on their DMS platforms.  That refusal has eliminated MVSC's ability to compete in the Illinois EVR market, and has placed a severe competitive handicap on MVSC's ability to compete in the California EVR market.

215.  Further, for purely anticompetitive and monopolistic reasons, CDK and Reynolds have blocked MVSC's ability to access DMS data by indirect means.

216.  It is feasible for CDK and Reynolds to provide MVSC with access to DMS data.

217.  Through their denial of access to an essential facility, CDK and Reynolds have harmed competition.

218.  As a direct and proximate result of Defendants' unlawful conduct, MVSC has suffered injury to its business or property.  MVSC is entitled to treble damages for the violations of the Sherman Act alleged herein.

## SIXTH CAUSE OF ACTION
## VIOLATION OF ILLINOIS ANTITRUST ACT
### (all Defendants)

219.   MVSC incorporates by reference the preceding allegations.

220.  Defendants CDK, Reynolds, and CVR have monopolized the EVR market in Illinois in violation of the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/3(3), for all the reasons set forth in the preceding allegations.

221.  Defendants CDK and Reynolds have also denied Plaintiff access to an essential facility in violation of the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/3(3), for all the reasons set forth in the preceding allegations.

222.  Defendants committed these violations willfully, as that term is applied under the Illinois Antitrust Act.

223.   As a direct and proximate result of Defendants' unlawful conduct, MVSC has suffered injury to its business or property.  MVSC is entitled to treble damages for the violations of the Illinois Antitrust Act alleged herein.

### SEVENTH CAUSE OF ACTION
### VIOLATION OF CARTWRIGHT ACT
### (all Defendants)

224.   MVSC incorporates by reference the preceding allegations.

225.   CDK and Reynolds, and their co-conspirator CVR, entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of the California Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, for all the reasons set forth in the preceding allegations.  Defendants' conspiracy is a per se violation of the Cartwright Act and is, in any event, an unreasonable and unlawful restraint of trade and commerce.

226.   As a direct and proximate result of Defendants' unlawful conduct, MVSC has suffered injury to its business or property.  MVSC is entitled to treble damages for the violations of the Cartwright Act alleged herein.

### EIGHTH CAUSE OF ACTION
### VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW
### (all Defendants)

227.   MVSC incorporates by reference the preceding allegations.

228.   The California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, defines "unfair competition" to include any "unlawful, unfair, or fraudulent business act or practice."

229.   Defendants have engaged in "unlawful" business acts and practices as alleged herein in violation of, among other laws, the Sherman Act, 15 U.S.C. §§ 1 and 2; the Cartwright Act, Cal. Bus. & Prof. Code § 16720; and California common law, including the torts of interference with contract and prospective economic advantage.

230.   Defendants' acts and practices as alleged herein have also been "unfair" under the UCL.  Defendants' conduct has threatened an incipient violation of the antitrust laws (namely, the Sherman Act, 15 U.S.C. §§ 1 and 2, and the Cartwright Act, Cal. Bus. & Prof. Code § 16720), violated the policy and spirit of those laws (resulting in an effect comparable to an antitrust violation), and significantly threatened and harmed competition in the California EVR market.  Furthermore, any utility from Defendants' conduct does not outweigh the harm it causes to competitors, car dealers, or car buyers.

231.   A substantial portion of the unlawful and unfair acts and practices alleged herein occurred in California and the harm to MVSC, car dealers, and car buyers was inflicted in California, for all the reasons set forth in the preceding allegations.

232.   As a direct and proximate result of Defendants' unlawful and unfair conduct, MVSC has suffered injury to its business or property.  MVSC is entitled to restitution in an amount to be proven at trial.

**NINTH CAUSE OF ACTION**
**VIOLATION OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE**
**BUSINESS PRACTICES ACT**
**(all Defendants)**

233.    MVSC incorporates by reference the preceding allegations.

234.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 Ill. Comp. Stat. 505/1 *et seq.*, makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices . . . in the conduct of any trade or commerce."

235.    Defendants have engaged in unfair methods of competition and unfair acts or practices in violation of the ICFA.

236.    Defendants' group boycott of MVSC, thereby eliminating the ability of MVSC to compete in the Illinois EVR market, is contrary to Illinois public policy, as expressed in statutes such as the Illinois Antitrust Act, 740 Ill. Comp. Stat. 10/1 *et seq.*, which favors free and fair competition between businesses.

237.    Defendants' conduct as alleged herein is oppressive and unscrupulous, and as a result of Defendants' group boycott of MVSC, Illinois car dealers lack a meaningful choice in EVR provider.

238.    By preventing competition in the EVR market, Defendants have caused substantial aggregate injury to car dealers in the form of inferior EVR services resulting from the absence of fair competition.  Defendants' actions have prevented car dealers from having a choice between EVR providers who can compete on

quality-adjusted price, including products and services such as technical support, dealer training, registration auditing (which reduces the rate of errors), and computer interface design. This injury is not outweighed by any countervailing consumer benefit resulting from Defendants' conduct. Because Defendants operate an EVR monopoly and exclude competitors such as MVSC, car dealers cannot reasonably avoid this injury.

239. Defendants' violations of the ICFA implicate consumer protection concerns because Defendants' unfair practices – namely, their monopolization of the Illinois EVR market through anticompetitive acts – are directed at and effect the statewide EVR market generally. MVSC's requested relief would serve the interests of Illinois car dealers by enabling new EVR providers, including MVSC, to compete for their business, resulting in increased consumer choice and market-driven innovation in EVR services.

240. As a direct and proximate cause of Defendants' violations of the ICFA, MVSC has been unable to enter into contracts with car dealers to provide EVR services. MVSC has suffered economic injury as a result.

241. A substantial portion of the underlying conduct and events alleged herein occurred in Illinois, for all the reasons set forth in the preceding allegations.

242. As a direct and proximate result of Defendants' unfair conduct, MVSC has been harmed by its inability to compete in the Illinois EVR market. MVSC is

MVSC'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

entitled under 815 Ill. Comp. Stat. 505/10a to restitution, damages – including punitive damages – in amounts to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, MVSC prays that the Court:

(a) adjudge and decree that the conduct alleged herein is an unlawful restraint of trade in violation of Section 1 of the Sherman Act;

(b) adjudge and decree that the conduct alleged herein is an unlawful monopoly, attempted monopolization, conspiracy to monopolize, and denial of an essential facility in violation of Section 2 of the Sherman Act;

(c) permanently enjoin the unlawful conduct alleged herein;

(d) order CDK and Reynolds to allow MVSC to participate in the 3PA and RCI programs on reasonable, nondiscriminatory terms;

(e) award MVSC damages, as provided under the federal antitrust laws and state antitrust laws, and that a joint and several judgment in favor of MVSC be entered against Defendants in an amount to be trebled in accordance with such laws;

(f) award MVSC its reasonable costs and expenses incurred in this action, including expert fees and attorney's fees;

(g) award MVSC prejudgment interest; and

(h) award MVSC any such further relief that the Court may deem just and proper.

MVSC'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

February 3, 2017                    Respectfully submitted,

                                    */s/ Gary Salomons*

                                    Gary Salomons (SBN 126280)
                                    Daniel J. Friedman (SBN 289670)
                                    GABRIELSALOMONS, LLP
                                    16311 Ventura Blvd., Suite 970
                                    Encino, CA 91436
                                    Telephone: (818) 906-3700
                                    Fax: (818) 906-2142
                                    gary@gabrielsalomons.com
                                    daniel@gabrielsalomons.com

                                    Michael N. Nemelka
                                    Aaron M. Panner
                                    Joshua D. Branson
                                    Joshua Hafenbrack
                                    KELLOGG, HUBER, HANSEN, TODD,
                                      EVANS & FIGEL, P.L.L.C.
                                    1615 M Street, N.W., Suite 400
                                    Washington, D.C. 20036
                                    Telephone: (202) 326-7900
                                    Fax: (202) 326-7999
                                    mnemelka@khhte.com
                                    apanner@khhte.com
                                    jbranson@khhte.com
                                    jhafenbrack@khhte.com

                                    *Counsel for Plaintiff Motor Vehicle Corporation*

MVSC'S COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF